UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard ROMERO, Defendant–
Appellant.

No. 98–2358.

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1999.

Decided Aug. 31, 1999.

Virginia M. Kendall, Office of U.S. Attorney, Chicago, IL, David S. Kris (argued), Department of Justice, Criminal Division, Appellate Section, Washington DC, for Plaintiff–Appellee.

John L. Sullivan (argued), Magidson & Sullivan, Chicago, IL, for Defendant–Appellant.

Before RIPPLE, MANION, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

This case began in the spring of 1995, when 36–year–old Richard Romero "met" a 12–year–old boy in a "chat room" on the Internet devoted to UFOs and extraterrestrials. The case raises interesting questions about the permissible scope of expert opinion testimony in "child molester" cases. We start with the facts, which are rather bizarre, to say the least.

The boy Romero met, who we'll call "Erich" in this opinion, lived in Mount Prospect, Illinois, a suburb of Chicago. Posing first as a 15–year–old boy, then as his 20–year–old brother, Romero exchanged e-mails and phone calls with Erich throughout 1995 and into 1996. Eventually, in March of 1996, Romero, who lived in St. Petersburg, Florida, at the time, convinced Erich to run away with him. The two boarded a bus in Chicago bound for St. Petersburg. Some quick investigative work by the local police and the FBI foiled the trip, as Romero and Erich were intercepted at the Greyhound bus station in Louisville, Kentucky. This activity led to four federal charges and two jury trials. But more on that later.

Romero was living in Florida in early 1995 when he met two "Christian Faith Healers"—Kim Wistey and his brother-in-law, Gregorio Rabano—who were traveling in the Sunshine State. Wistey and Rabano, who (according to the defendant's brief) were "ordained in the Church of the Children of Tzaddi," lived in adjacent homes in West Des Moines, Iowa. Romero told Wistey and Rabano the "story" of his life. He said he was genetically engineered by the National Security Agency and that he grew up in a laboratory. His body contained alien parts, and he could download all the information in another person's brain during a handshake. He was in contact with the Vegans, an extraterrestrial race, and he could log onto computer networks with his mind and heal the sick with his psychic powers. Even more weird than this tale is the fact that Wistey and Rabano believed it (or at least part of it). Rabano hoped Romero could heal his daughter, who had a scar on her face from a recent dog bite, and his mother, who had cancer, so Rabano and Wistey invited Romero to return with them to Des Moines. Romero did so and began living in Rabano's basement in February of 1995.

Shortly after his arrival in Iowa, Romero explained to the Rabanos and Wisteys that the "High Council of Vega" contacted him to say that there was a "pot of gold" in cyberspace which had accumulated 5 cents from every tax return ever filed with the IRS. Romero promised to share the pot of gold with the Rabanos and Wisteys if they would help him find it. Amazingly, the Wisteys and Rabanos believed Romero again and purchased first one and then several computers for him to use in conducting his search. They also provided Romero with an America Online (AOL) Internet account and Wistey's credit card numbers so he could make purchases necessary for his quest. Romero's hosts hoped to use their share of the pot of gold to open a faith healing center.

Unfortunately for the Wisteys and Rabanos, Romero was far more interested in child pornography than searching for the cyberspace pot of gold. He began mail ordering pornographic magazines and videotapes on the Internet and by telephone and charging them to Wistey's credit cards. The Wisteys and Rabanos did not know the contents of the packages that arrived for Romero, and he told them not to enter his room in the basement because it could affect his safety while he was traveling in cyberspace.

As we related earlier, Romero first encountered "Erich" in an Internet chat room devoted to UFOs and extraterrestrials. Romero introduced himself as "Kyle,"

a 15–year–old boy. He said his father had been killed by government agents because he knew too much about UFOs. He asked Erich to join him in a mission to uncover secrets about aliens and UFOs. During the summer of 1995 Romero and Erich frequently exchanged letters and e-mails. Erich told Romero he was seeing a psychiatrist for Attention Deficit Disorder (ADD), that he was adopted, and that his parents were too restrictive and did not understand him. Romero sympathized with Erich's situation and told him that he, too, was adopted and having trouble with his parents. By the end of the summer Erich considered "Kyle" to be his best friend.

Meanwhile, "Kyle" was having troubles at home. In June of 1995 Mrs. Rabano found his collection of child pornography while she was cleaning his basement living area. Wistey and Rabano confronted Romero and considered kicking him out of the house. Romero, however, had another tale to tell. Apparently the "Vegan Galactic Council" was helping him research ways to extend his life by extracting psychic energy from pictures of young boys. He pleaded for forgiveness and promised he would no longer use the Internet to order pornography. After much agonizing, Rabano and Wistey relented and allowed Romero to continue accessing the Internet as long as his work was limited to searching for the elusive pot of gold.

In late August Rabano received a phone bill for the month of July of around $1,200. Most of the calls were made to a few numbers from Romero's separate phone line in the basement. The Rabanos were used to paying around $300 per month in AOL fees, but they considered those charges an investment in Romero's efforts to find the pot of gold. The extra big phone bill was something new. When confronted, Romero claimed the bill reflected further Internet charges. Rabano didn't know much about the Internet or how Internet service provider billing worked, but Wistey took the phone bill and called several of the numbers that Romero had called repeatedly in the month of July. He discovered that they were not Internet service providers but private homes. The week before Labor Day Rabano and Wistey confronted Romero again. They made him clear his room of pornographic materials. The magazines and videotapes—all containing child pornography involving young boys—filled four trash bags. It took over 3 hours to burn the paper materials in the Wisteys' fireplace. The videotapes were slashed with a knife and tossed into the trash. Wistey also had the phone company restrict Romero's ability to make long-distance phone calls, and he closed Romero's AOL account and opened a new one billed to a new credit card number. Romero promised not to order any more pornography or e-mail any young boys.

Around this same time "Kyle" told Erich that his mother had restricted his long-distance phone use and that he was depressed and suicidal. He told Erich he would be going away for awhile, but that someone else would soon contact Erich on his behalf. When Wistey opened his new AOL account in late August, Romero immediately contacted Erich again, this time assuming the persona of "Rick," Kyle's older brother. By the end of October, "Rick" and Erich were best friends.

In late October of 1995 the Wisteys and Rabanos discovered that Romero was continuing to use the Internet to contact young boys when some child pornography arrived in the Rabanos' mail. In early November they finally kicked him out of the house. He apologized but explained that he was addicted to young boys and needed to extract their energy. He also told them he would never actually have sexual contact with the boys because his own energy would destroy them. Wistey bought Romero a bus ticket to Florida. More child pornography arrived in the mail at the Rabanos after Romero left Des Moines.

Back in Florida, Romero contacted two boys in Tampa—we'll call them David and

Michael—he had met on the Internet during his time in the Rabanos' Iowa basement. He told the boys he was "Ricardo" from Spain and was staying with his uncle in Des Moines to avoid an arranged marriage at home. David and Michael were interested in religion and the occult and Romero created a religion in which he, the two boys, and two of their friends were the only members. In October 1995 Romero e-mailed the boys and described certain religious rituals for them to perform. Initially the rituals involved only incantations and drops of blood, but eventually they became sexual in nature. David and Michael refused to perform the sexual rituals Romero sent them. When the Rabanos kicked him out, Romero told the boys that he left Iowa because he had defied his family's order to return to Spain. Upon his arrival in Florida, David and Michael recommended that Romero stay at a cheap motel near their homes. He did so. David later ran away from home and stayed with Romero for about two weeks. Romero made no direct sexual overtures toward David (or Michael) during this time, but David did discover child pornography on Romero's computer.

In January 1996 Romero (as "Rick") persuaded Wistey to buy him another computer. Wistey had the computer delivered to Romero in Florida. When he was back on the Internet Romero began corresponding with Alex Kozlowski, a pornography dealer. Romero mail ordered several videotapes from Kozlowski featuring erotic "wrestling" between men and young boys. He discussed his sexual interest in young boys and asked Kozlowski not to think him a "pervert." He also described specific sexual fantasies about a boy he knew. That boy had the same first name as "Erich." Romero offered to make an erotic video with this boy for Kozlowski to distribute. He also told Kozlowski that he first wanted to show the boy some erotic tapes in the hope that it would get the boy interested.

During this time Romero was also in touch with Erich via phone and the Internet. He encouraged Erich to run away from home and join him in St. Petersburg. He asked Erich to send him a letter and a picture. In February Erich wrote a letter to Romero arranging to meet him near his home. Erich enclosed a picture of himself in the letter. Erich showed the letter to his parents and taunted them with it, telling them he was going to run away. They immediately arranged a meeting with his counselor. The counselor made Erich tear up the letter and leave the pieces with her. The next day, using a number that had appeared on the family's long-distance phone bill, Erich's mother called Romero. She explained that her son had emotional problems and she asked Romero to leave him alone. Romero told her that Erich had talked of running away, but that he had not encouraged him. He promised to try to "smooth things out" with Erich. Instead, Romero e-mailed Erich and reported that his mother had said horrible things about him and tried to turn Romero against him. The next day, Erich sent another letter and photo to Romero, and they arranged to meet at the Ramada Inn in Mount Prospect, which was close to Erich's house.

Romero was still in contact with Wistey at this time. Wistey told him that a friend of his was having legal troubles with the Securities and Exchange Commission in Chicago. Romero offered to fly to Chicago, access federal government computers there, and help Wistey's friend out. Wistey purchased a plane ticket for Romero as well as two Personal Digital Assistants (PDAs) which are capable of sending e-mail messages using cellular phone networks. Romero left one of the PDAs with David, who had again run away from home and was staying with Romero. On March 14, 1996, Romero flew to Chicago and checked into the Ramada Inn under the name Ricardo Romero. The next morning (ironically, or coincidentally, the day—March 15—was Romero's 37th birthday) Erich left for school but went instead to

the Ramada Inn to meet Romero. After they met, Romero called a taxi to take them to the bus station. He told Erich not to talk to the taxi driver. At the bus station he purchased two one-way tickets to Florida with cash. He told Erich not to talk to anyone or draw attention to himself while they waited for the bus. Romero told Erich that it would be best for him to live in Florida and not return to his parents. Erich testified that he would have never accompanied Romero to Florida if he had known that Romero wanted to engage in sexual activity with him, and expert testimony at trial established that Erich's emotional problems and ADD made it impossible for him to consent to the trip.

Some quick police work by the local authorities and the FBI assured that Romero never had the chance to try anything. Because Erich had attendance problems in the past, his school immediately called his mother when he did not show up that morning. His mother called the police. She told them about Erich's contacts with Romero. She also found a reference to the Ramada Inn in Erich's belongings, and the police started their search there. Luckily for them, Romero had checked into the inn using his correct last name, and the police and FBI were able to trace his movements from checking out to the taxi and the bus station. At the hotel, Romero had listed a home address in New York, but he had made two phone calls to Florida from the phone in his room. As it turned out, there was no scheduled bus service to New York that day, but there was a bus that left for Florida in the afternoon. That night, the investigators called an FBI agent at his home in Louisville, Kentucky, and told him to check a bus that was scheduled to stop there at 10:15 p.m. The agent raced to the station and found Romero and Erich seated in the rear of a bus as it was stopped at the Louisville Greyhound station. Romero was taken into custody and Erich was reunited with his parents, who drove to Louisville to retrieve him.

The next day, Romero called David in Florida (from the county jail in Louisville) and told him to "get rid of all the stuff; like, make it so they couldn't get on the computers, just go through and try to find anything that needs to be gotten rid of." David began deleting the child pornography on Romero's computer, but when FBI investigators arrived that evening they were able to retrieve most of what David had tried to ditch. Romero also called a friend in Florida and told him to expect a letter. When the letter arrived it said: "I need a huge favor from you. At the storage area of our apartment you will find ... a heavy box. Inside is a lot of stuff that could be really bad for me if the FBI get their hands on it. It's a folder with stuff. You have to destroy. Take the papers away and dump them at a faraway dumpster.... Rip them or burn them if you can." The friend was not as loyal as Romero hoped. He went to the storage area, found the child pornography Romero had referred to, and turned the materials in it over to the FBI.

Romero was eventually charged with four crimes: kidnaping under 18 U.S.C. § 1201(a)(1) and transporting a minor with intent to engage in criminal sexual activity under 18 U.S.C. § 2423(a) for inveigling Erich to leave his home and travel to Kentucky; traveling in interstate commerce for the purpose of engaging in a sexual act with a juvenile under 18 U.S.C. § 2423(b) based on his trip from Florida to Illinois; and obstructing justice under 18 U.S.C. § 1512(b)(2)(B) because of his efforts to get people in Florida to destroy evidence. Romero went to trial, and the jury acquitted him of traveling to Illinois for the purpose of engaging in a sexual act with Erich but it convicted him on the obstruction of justice charge. The jury could not reach a verdict on the kidnaping and interstate transportation charges, which were tried before a second jury. At closing argument in that trial the defense argued that Erich consented to travel with

Romero, which negated, if believed, the kidnaping charge. Romero did not dispute his keen interest in child pornography or his sexual fantasies about Erich, but he argued that he did not intend to follow through on his fantasies. The second jury rejected these defenses and convicted Romero of the kidnaping and transportation charges. Judge Charles P. Kocoras then sentenced him to 327 months in prison. Romero appeals his convictions and his sentence. The obstruction conviction from the first trial is not challenged.

■ The first issue raised on this appeal is whether Judge Kocoras abused his discretion when he admitted the testimony of the prosecution's FBI expert on child molesters. Before trial, the government filed a notice of its intent to use the testimony of Agent Kenneth V. Lanning, who had spent many years studying the sexual exploitation of children and produced over 20 publications, to talk about the subject of child molestation. The prosecution proposed to have Agent Lanning testify regarding (1) characteristics of "preferential" child molesters and the methods they used to attract and abuse children; and (2) his opinion that Romero is a child molester with an interest in adolescent boys and that Romero had a sexual interest in Erich. Romero filed a motion in limine to exclude Agent Lanning's testimony, arguing that the expert could not offer his opinion about Romero's intent with respect to Erich under Federal Rule of Evidence 704(b) because it would involve the ultimate issue the jury was impaneled to decide. Romero also argued that Lanning's testimony would be unduly prejudicial under Rule 403 because it amounted to impermissible "profiling."

In response to the defense arguments, the government offered that it would limit Lanning's testimony to the methods and techniques employed by preferential child molesters. The prosecution would not ask Lanning to give his opinion about Romero or to comment about his intent or culpability. Subject to these limitations, Judge Kocoras allowed Agent Lanning to testify, noting that the testimony would be highly probative:

> [T]here was not any question really in my mind as to the propriety of his testimony as a general matter [in the first trial], highly relevant and, in fact, in my judgment, superior to, I think, someone who might offer some psychiatric testimony along the lines of characteristics and what people do and do not do given certain characteristics and impulses.
>
> Here is a man who studied the field extensively, an acknowledged expert in the field. And I do not think there is any question whatever that his testimony meets all the criteria of the 700 series, and is particularly helpful to the jury because he has had an abundance of training and experience far beyond any lay person, certainly, and far beyond, I think, most experts in the field.

Judge Kocoras thus denied the motion to exclude Lanning's "testimony in general." The judge, however, agreed with the defense concern that Lanning's testimony could possibly invade the province of the jury and usurp their function in determining whether Romero had the requisite criminal intent. For that reason, Judge Kocoras encouraged the defense to object to Lanning's testimony on a question-by-question basis if it seemed that he was going too far.

At trial (all references are to the second trial) Lanning testified that his observations arose from his expertise about child molesters in general, not from the specific facts of the case. He then explained his role:

> As I understand it, what I am going to do is provide or share the information that I have concerning the nature of certain types of offenders and provide this information to people who would not otherwise be aware and have this kind of knowledge because of their experiences and work.

Lanning then opined that child sex offenders fall on a spectrum from "situational sex offenders," whose activities are based on an accident of circumstance, to "preferential sex offenders," who have a definite preference for sexual contact with children and methodically pursue such contact. He identified four general traits usually exhibited by preferential sex offenders, all of which he had described in published materials long before the Romero case.

First, the conduct of a preferential child molester "is not a temporary, opportunistic kind of thing," but "occur[s] over a long period of time and is extremely persistent." These preferential molesters spend what to the normal person looks like unbelievable amounts of time and energy on their sexual pursuits. They may spend "a lot of time with kids, trying to lower their inhibitions, target them, find out where they are, how they can be maintained, contact with them, develop a method of access to those children." Such offenders can also spend enormous amounts of time on the Internet trying to meet children and develop seemingly innocent relationships with them, and it is not uncommon for an offender to be involved with several children at the same time.

Second, Lanning said that preferential sex offenders have very specific interests and that they focus on certain kinds of children. Sometimes this specificity—for example, "a preference for boys 10 to 15; for girls, 3 to 5, or something like that"—is caused by the offender's unusual arousal patterns. Sometimes the preference is more pragmatic. For example, some offenders "target children who come from dysfunctional families and broken homes" or who suffer from ADD because those children are easier to manipulate.

Third, Agent Lanning explained that preferential sex offenders typically "identify a need in a child and then move forward to temporarily fill that need in the child as part of this process." The offender might seduce the child by expressing an interest in the child's problems at home or a topic of specific interest to the child. He might also try to "mirror" the child's problems, telling the child he understands because he has the same problems. This technique is used to gain the child's trust and confidence so that the child feels the offender is someone who cares about him or her. The offender may also try to drive a wedge between the child and family members or other members of his or her support network to "maximize the child's dependence" on the offender.

Finally, Lanning testified that preferential offenders "engage in fantasy and need-driven behavior." They almost always collect child pornography, and they might also keep records of their encounters with children. They do these things compulsively even though they know their actions increase the risk that they will be caught. Agent Lanning did state, however, that "I am not getting carried away saying that anybody who has [child pornography] in their house" is an active child molester.

After extensive testimony regarding each of these four traits and examples of actions that fit these traits, Agent Lanning wrapped up his direct testimony by explaining again how the jury should use his testimony. He hoped it would help the jury get past popular conceptions of child sex offenders as "strangers who snatch and grab children" by "dragging them into a car," or as parents or stepparents who molest children in the home. He also said that "most people, unless they really focus on this or know somebody this happened to, don't really understand this kind of an offender who does not look like a dirty old man with a wrinkled raincoat" and that "people who are evaluating these facts need to have some kind of understanding or education in these kinds of offenders and how they operate." Lanning emphasized that the jury should look at all the facts and circumstances, not just a few isolated traits, to determine whether Romero intended to molest Erich.

During a vigorous cross-examination, the defense forced Agent Lanning to admit

that there is often a large gap between someone who merely collects child pornography and someone who actually molests children. Lanning also admitted that a mere preferential collector of child pornography could exhibit the same "long-term and persistent pattern of behavior" in collecting as a preferential molester who acts out his fantasies. The main difference between the collector and the molester is that the molester would take the additional step of engaging or trying to engage in sexual behavior with children.

The redirect examination of Lanning focused on the question of how to distinguish between a mere collector and a child molester. The prosecution posed a series of hypothetical actions to Lanning and asked him if these actions would indicate someone who would act on his sexual fantasies about children. Not surprisingly, the hypotheticals described actions taken by Romero that had already been produced in evidence: establishing a 9–month relationship with a young (age 12 at the time it started) boy on the Internet; traveling hundreds of miles to meet a 13–year–old; meeting a young boy in a hotel room; spending long hours communicating with multiple young boys; and discussing a sexual interest in children with another adult. Lanning testified that each of these actions would be some indication that the offender in question would act upon his fantasies.

■ The admission of expert testimony in federal court is governed by the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This court reviews *de novo* the question of whether a district court followed the *Daubert* framework, but reviews only for abuse of discretion a district court's application of that framework. *See United States v. Hall*, 165 F.3d 1095, 1101 (7th Cir.1999); *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir.1996); *United States v. Romero*, 57 F.3d 565, 570 (7th Cir.1995).

*Daubert* emphasized the district court's gatekeeper role when it comes to the admission of scientific evidence under the Federal Rules of Evidence. *See* Fed. R.Evid. 702–706. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Daubert* the Supreme Court provided a nonexhaustive list of factors that make scientific evidence sufficiently reliable for admission. The Court applied its *Daubert* analysis to nonscientific evidence in *Kumho Tire Co. v. Carmichael*, —— U.S. ——, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Court concluded that the test for reliability for nonscientific experts is "flexible" and that "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* The Court held that the district court has "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.*

The defense claim that the district court erred in finding that Lanning's testimony in general would be reliable and helpful to the jury is baseless. The testimony was critical in dispelling from the jurors' minds the widely held stereotype of a child molester as "a dirty old man in a wrinkled raincoat" who snatches children off the street as they wait for the school bus. Many real-life child molesters use modern technology and sophisticated psychological techniques to "seduce" their victims.

This court has recognized the value of expert testimony in explaining a complicated criminal methodology that may look innocent on the surface but is not as innocent as it appears. Such modus operandi evidence has proved useful in drug trafficking cases. *See United States v. Brown*, 7 F.3d 648, 652 (7th Cir.1993); *United States v. Foster*, 939 F.2d 445 (7th Cir.

1991). Specifically, experts have testified regarding various countersurveillance techniques used by drug dealers to avoid detection (*see United States v. DeSoto*, 885 F.2d 354, 360 (7th Cir.1989)); the use of beepers by drug dealers to arrange transactions (*see United States v. Solis*, 923 F.2d 548, 550–51 (7th Cir.1991)); and the quantity, purity, usual dosage units, and street value of illegal drugs (*see United States v. Amaechi*, 991 F.2d 374, 377–78; *United States v. Douglas*, 874 F.2d 1145, 1154 (7th Cir.1989)).

In the same way, the main thrust of Agent Lanning's testimony described the modus operandi of modern child molesters: devoting large amounts of time to finding and establishing relationships with children; choosing emotionally or mentally disturbed children because of their susceptibility to manipulation; probing the child's needs and interests and then mirroring those needs or attempting to fulfill them; and engaging in compulsive behavior even when that behavior increases the risk of getting caught. This testimony illuminated how seemingly innocent conduct such as Romero's extensive discussions with Erich about UFOs and his troubled home life could be part of a seduction technique. At least one other appellate court has considered expert testimony by Agent Lanning. *See United States v. Cross*, 928 F.2d 1030 (11th Cir.1991). In that case the defendant was in possession of nude photographs of children. He claimed that these photos were innocent "nude studies," and apparently the photos were open to such an interpretation. In describing the habits of pedophiles, Agent Lanning testified that such persons often derive sexual satisfaction from and collect such seemingly innocent materials. This testimony shed light on a critical issue in the case—whether the defendant obtained the photos with the intent to produce child pornography. The Eleventh Circuit held that Lanning's testimony was perfectly permissible for this purpose. *See id.* at 1050–51. Similarly, there is no question that allowing Agent Lanning to testify in our case was generally proper because his testimony was helpful to the jury in understanding how child molesters operate—something with which most jurors would have little experience.

The defense does raise a couple of legitimate concerns, however, about the scope of Agent Lanning's testimony. First, Romero argues that some of Lanning's testimony violated Federal Rule of Evidence 704(b) because he indirectly opined that Romero intended to molest Erich. The defense also argues that some of Agent Lanning's testimony constituted "group character evidence" in violation of Rule 404. One problem with both of these arguments is that throughout Lanning's long direct and redirect testimony the defense never objected to any question or answer. Not once. And this despite the district judge's specific invitation during pretrial proceedings to deal with objections to Lanning's testimony on a question-by-question basis. The judge had even noted at the pretrial proceeding his concern that some of Lanning's testimony might be improper. Because the defense never objected,[1] claims regarding specific questions and answers during Lanning's testimony have not been preserved for appeal, and we will reverse the district court only on a finding of clear error. Such a finding would require Romero to "not only prove that the admission of the testimony was error, but also that reversal is required to prevent a miscarriage of justice." *See United States v. Doe*, 149 F.3d 634, 636 (1998) (quotation omitted). None of the concerns raised by the defense about Agent Lanning's testimony approach this standard.

Federal Rule of Evidence 704(b) provides that

---

1. Romero's lawyer, John L. Sullivan of Chicago, mounted a vigorous and imaginative defense to the charges, and he apparently decided not to object to specific questions for tactical reasons. That decision was certainly not unreasonable.

[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

The defense contends that Agent Lanning invaded the province of the jury when he responded to "hypotheticals" that mirrored the actual actions of Romero. He responded that in his expert opinion the actions described such as cultivating a long-term relationship with a juvenile and traveling hundreds of miles to meet that juvenile tend to indicate an offender who is going to "act out" or go beyond mere fantasy. According to the defense, this testimony is tantamount to Lanning opining that Romero had the intent to molest Erich when he transported him in interstate commerce.

To support its position, the defense relies on *United States v. Boyd,* 55 F.3d 667, 671 (D.C.Cir.1995). In *Boyd* the D.C. Circuit considered the testimony of an expert on drug trafficking who opined that the facts of the case (two men seen looking into a plastic bag that contained crack, then running and discarding the bag when the police approached) showed "possession with intent to distribute." *Id.* at 669. The D.C. Circuit reasoned that Rule 704(b) creates a line that expert witnesses may not cross. Expert witnesses may not opine as to the criminal mental state of a defendant, and the prosecution may not make an end run around this rule by posing an "intent" question as a hypothetical. *See id.* at 669–72.

In this circuit, however, we have taken a somewhat more lenient approach to this type of testimony. In *United States v. Brown,* 7 F.3d 648 (7th Cir.1993), we considered testimony very similar to that in *Boyd.* Again the defendant was in possession of crack, and the only issue in the case was whether he had the intent to distrib-

ute it. When asked what the circumstances of the case indicated to him, the expert responded over a defense objection, "[t]hat this crack cocaine was intended for distribution." *Brown* at 650. When asked why, he pointed to "the fact that there was no paraphernalia, no smoking device found on the·individual, and the weapon that was found." *Id.* On appeal, the defense argued that the expert had crossed the Rule 704(b) line. We reasoned, however, that, viewed in context, the expert was "merely suggesting that . . . this crack probably would be distributed rather than used by" the defendant himself. *Id.* at 653. The expert was merely expounding on his earlier testimony that a mere user of crack would usually carry a pipe and would rarely carry such a large supply of crack at one time, whereas dealers usually carry weapons to protect their supply. Thus, the expert's testimony analyzed the facts supporting an inference that the defendant had the intent to distribute "without directly addressing [the defendant's] actual mental state." *Id.*

Agent Lanning does not even approach the Rule 704(b) line drawn in *Brown.* While his redirect testimony addressed some of Romero's actions served up in the form of hypotheticals, he never directly opined as to Romero's mental state when he crossed state lines with Erich in tow. And even if we were to accept the D.C. Circuit's formulation of the Rule 704(b) line, Agent Lanning's testimony does not cross it. The agent's testimony focused primarily on the modus operandi—on the *actions* normally taken by child molesters to find and seduce their victims. On redirect he explained for the jury what types of actions might distinguish the actual molester from the mere collector of child pornography. His testimony did not amount to a statement of his belief about what specifically was going through Romero's mind when he met Erich. Therefore, we conclude that Agent Lanning's testimony did not violate Rule 704(b) as analyzed in *Boyd* and *Brown.*

■ The second concern the defense raises regarding Lanning's testimony is whether it amounted to impermissible "group character evidence" under Rule 404(a): "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." According to the defense, Lanning described a profile of the character traits of preferential sex offenders who have a propensity to molest children. He opined through the prosecution's hypotheticals that Romero fit the profile. The prosecution therefore successfully presented evidence to the jury of a trait of Romero's character—his alleged propensity to molest children—in order to show that he acted in conformity with that trait. The bulk of Lanning's testimony, however, did not have anything to do with "character." As we have noted before, it is difficult to come up with a comprehensive definition of "character evidence," but in general, it is evidence that "refers to elements of one's disposition, such as honesty, temperance, or peacefulness" which show a propensity to act a certain way in a certain situation. *United States v. Doe,* 149 F.3d 634, 638 (7th Cir.1998) (quotations omitted). Although Agent Lanning used a profile of the four major "characteristics" of a preferential sex offender, he focused primarily on the behavior and actions of such offenders to explain their techniques or modus operandi. He described each of the four "traits" in terms of behavior: long–term persistent efforts to cultivate relationships with potential victims; targeting of children who have emotional or mental problems; efforts to identify a child's needs or interests in order to "mirror" them; and engaging in "need-driven" behaviors even though such actions might get them caught.

Presenting character evidence is an attempt to use a person's personality or psychological propensity to prove what the person did. Testimony that a defendant is hot-tempered might be used to prove that he threw the first punch in a fight. Agent Lanning's testimony did exactly the opposite. It was an attempt to use Romero's actions to prove his psychological propensities—his intentions for Erich. As such, it was not really character evidence at all. To the extent that Agent Lanning discussed the preferences and psychological proclivities of sex offenders, he did so only to elaborate on his behavior-driven analysis of their modus operandi.

We have stated before that we are generally "sympathetic to the core concern underlying the 'group character evidence' argument"—that the jury will conclude that the defendant is guilty based only on his membership in some nefarious group. *Doe* at 638. Rule 404, however, includes no reference to "group character evidence." The rule addresses the problem of the prosecution parading a defendant's acquaintances before the jury to make slanderous remarks, such as "He's a violent, hot-tempered man" or "She's a liar." Such remarks are inadmissible because they are often subjective and unreliable and because a criminal conviction should be based on a defendant's actions, not on his or her general character. Agent Lanning never remarked on Romero's character; he did not know Romero personally. Lanning's testimony was a careful explanation of techniques used generally by child molesters much like the expert testimony regarding techniques used in the drug trade in the cases we have cited. To the extent that Lanning discussed Romero specifically through the prosecution's hypotheticals, he addressed the defendant's actions and how those actions might be interpreted. Lanning's testimony was not evidence of Romero's character. There was no error in admitting it.

■ The next issue the defense raises is whether recordings of Romero's phone conversations with other young boys were properly admitted into evidence. When FBI agents searched Romero's computer they found six audio recordings from his phone conversations with young boys

with dates ranging from May 1995 to March 1996—roughly the same period during which he cultivated his relationship with Erich. During the conversations Romero expressed his desire to have sex with the boys and employed many of the same seduction techniques he used in conversations with Erich. Prior to trial the prosecution filed a motion to have the recordings admitted for two purposes. First, the government said the conversations showed that Romero lied to and misled Erich, a key component of the kidnaping by inveigling charge. Second, the conversations prove Romero's intent when he traveled to Chicago and tried to return to Florida with Erich. Judge Kocoras admitted the conversations as highly probative of intent, the "key issue" in the case: "The question is: Was he well-intentioned in coming to Chicago ... and escorting this boy back to, presumably, Florida; or was he ill-intentioned?"

■ On appeal, the defense contends that admitting the conversations was error because their probative value was outweighed by the risk of unfair prejudice they created. See Fed.R.Evid. 403. Rule 403 requires balancing the probative value of evidence against its potential for causing unfair prejudice within the context of the trial as a whole with all its intangibles. Because the trial judge is in a unique position to make accurate Rule 403 determinations, our review of the district court's Rule 403 analysis is deferential. See United States v. Hall, 165 F.3d 1095, 1104 (7th Cir.1999).

It is clear that the conversations in question were highly probative of Romero's intent. Although Romero never actually mentioned sex to Erich, these conversations show that he had a distinct sexual interest in young boys and had previously discussed acting on that interest. Each of the interactions with the other boys involved the same seduction techniques used on Erich and identified by Agent Lanning as the modus operandi of child molesters

generally: assuming the identification of a teenage boy named "Kyle"; expressing emotional intimacy with the boy; giving advice about personal problems; expressing interest in the boy's interests; "mirroring" the needs of the boy and seeking to fulfill those needs; and asking the boy to meet him in a hotel. This is classic modus operandi evidence used to respond to the defense argument that Romero had only innocent intentions for Erich and wanted to help him.

■ At least one of the conversations, however, also created a danger of unfair prejudice. In it, a young boy told Romero the story of his teenage brother who had been brutally raped by someone he met online:

> Bryan: Oh, well you have to be careful 'cause somebody, uhmm ... took him, and they like did all kinds of things to him.
>
> Romero: But why, what, what's happen ... what he did?
>
> Bryan: They like ... they like fucked him until he had, till he was bleeding and we had to take him—
>
> Romero: This gonna be between us.
>
> Bryan: We had to take him to the hospital.
>
> Romero: Oh, no!
>
> Bryan: And they had to sew him back together. And they're re-really ...

> \* \* \*

> Romero: What's happened to him ... why he go to in hospital?
>
> Bryan: Because a guy did all kinds of things to him. Romero: Somebody beat him?
>
> Bryan: No, they, they had sex with him.
>
> Romero: Who, who, who did this to him?

> \* \* \*

> Bryan: No, he was, uhmm, someone from, from America On Line.

■ This discussion of an incident that did not involve Romero and may never have happened at all[2] created a danger that the jury would react emotionally against Romero out of disgust at the brutal victimization of a child. The prosecution responds that this conversation was highly probative of Romero's intent because immediately after discussing the rape of Bryan's brother, Romero again expressed a desire to meet Bryan at a hotel in Las Vegas and have sex with him. We are not entirely convinced that the value of this conversation in particular is enough to cancel out its potential to improperly provoke the emotions of the jury. It is, however, a close call. As such it was entirely within the discretion of Judge Kocoras to admit the conversation into evidence. In addition, even if the admission was an abuse of discretion, it was harmless. Removing one of the six conversations would not have affected the overwhelming direct evidence that Romero kidnaped Erich and the ample indirect evidence that he had sexual intentions when he did so. Romero's other five conversations with young boys as well as his conversations with a child pornographer about his sexual interest in Erich leave no doubt that the trial outcome would have been the same with or without the admission of the recorded conversation with Bryan.

■ Finally, Romero challenges his sentence under the federal guidelines.[3] We review *de novo* the district court's interpretation of the sentencing guidelines, and review the court's findings of fact for clear error. *See United States v. Owolabi*, 69 F.3d 156, 162 (7th Cir.1995).

■ The defense first challenges the base offense level selected by the district court. At issue is the meaning of the term "criminal sexual abuse." Romero's conviction for transporting a minor with intent to engage in criminal sexual activity first referred the district court to guideline § 2G1.2, which contains a cross reference to § 2A3.1 for offenses involving "criminal sexual abuse [or] attempted criminal sexual abuse." Judge Kocoras held that Romero's actions constituted attempted criminal sexual abuse under § 2A3.1. The defense argues that criminal sexual abuse is defined for sentencing purposes by the nonjurisdictional elements of 18 U.S.C. § 2241 Aggravated Sexual Abuse or 18 U.S.C. § 2242 Sexual Abuse because the two statutes are used for the definition in guideline § 2A3.2(c), which also cross-refers to § 2A3.1. Sections 2241 and 2242 both require the use of force or threatened use of force. The defense argues that Romero should not have been sentenced under the criminal sexual abuse guideline because he never used or attempted or threatened to use "force" in his interactions with Erich. Judge Kocoras found that the defendant's use of "psychological force" in kidnaping Erich by inveigling was sufficient to meet the elements of § 2241. He also found that § 2241 and 2242 do not necessarily encompass the whole definition of criminal sexual abuse under the guidelines and that "[t]he guideline [§ 2A3.1] captures ... precisely the evidence in this case and this conduct." We agree.

■ The defense contends that Romero should have been sentenced under § 2A3.2 Criminal Sexual Abuse of a Minor (Statutory Rape) or Attempt to Commit Such Acts. This suggestion belies the seriousness of Romero's actions. The evidence shows that Romero used psychological force in an attempt to overcome Erich's will and cause him to engage in a sexual act. An attempt requires the intent to commit a crime plus a substantial step toward its commission. *See United States*

---

**2.** Prior to playing this segment the prosecution elicited testimony from an FBI agent that the FBI did not believe Romero was involved in the incident described. There was also no evidence to corroborate Bryan's story.

**3.** Romero was sentenced under the 1995 federal sentencing guidelines.

v. *Saunders,* 166 F.3d 907, 915 (7th Cir. 1999). The jury's verdict established Romero's intent to have Erich engage in a sexual act, and Romero took substantial steps toward that end. Ultimately he kidnaped Erich and came dangerously close to accomplishing what in all likelihood was his goal. To sentence Romero under the statutory rape guideline would unduly diminish the seriousness of his conduct. Using the guideline for criminal sexual abuse was a much more appropriate fit.

 The defense next challenges the district court's decision to enhance Romero's sentence under guideline § 2A3.1(b)(5) because he abducted Erich. Under guideline § 1B1.1 "abduction" means "that a victim was forced to accompany an offender to a different location." Romero argues that because he did not use actual or threatened force on Erich the abduction enhancement was error. At least two courts of appeals, however, have held that abduction under § 2A3.1(b)(5) means kidnaping—whether kidnaping was committed by force or by the use of a force substitute such as inveigling. *See United States v. Saknikent,* 30 F.3d 1012, 1014 (8th Cir.1994); *United States v. Pollard,* 986 F.2d 44, 46–47 & n. 4 (3d Cir.1993). Kidnaping equals abduction, and abduction equals kidnaping. There was no error in the abduction enhancement.

Romero's final claim is that the district court double-counted when it increased his sentence based on the victim's age under guideline § 2A3.1(b)(2)(B) and increased his sentence again based on the victim's vulnerability under § 3A1.1. Note 2 to § 3A1.1 provides that a vulnerable-victim enhancement based on age is not appropriate when the victim's age is already considered in the offense guideline as in § 2A3.1(b)(2)(B). Note 2 also provides, however, that the vulnerable-victim enhancement may be imposed based on other factors:

> Do not apply [the vulnerable-victim enhancement] if the offense guideline specifically incorporates this factor. For

example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied *unless the victim was unusually vulnerable for reasons unrelated to age.*

(Emphasis added.) Judge Kocoras found that young Erich was unusually vulnerable due to his mental and emotional problems which were unrelated to his age and that Romero knew of that vulnerability. In fact, there was evidence that Romero targeted Erich because of his vulnerability. Therefore, it was entirely appropriate to increase Romero's sentence based both on Erich's age and on his unusual vulnerability.

AFFIRMED.