FILED
United States Court of Appeals
Tenth Circuit

April 23, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

WILLIAM BATTON,

Defendant-Appellant.

No. 09-8079

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 1:09-CR-30-1-ABJ)**

*Submitted on the briefs:*

Michael J. Krampner, Krampner, Fuller & Associates Attorneys At Law, L.L.C., Casper, Wyoming, for Appellant.

Stephanie I. Sprecher, Assistant United States Attorney, David A. Kubichek, Assistant United States Attorney, and Christopher A. Crofts, United States Attorney, District of Wyoming, Office of the United States Attorney, Casper, Wyoming, for Appellee.

Before **LUCERO**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

William J. Batton was prosecuted and convicted for transporting a fourteen-year-old family friend to Chicago, where he sexually assaulted him. After receiving a sentence of 360 months under the Interstate Transportation of a Minor for Unlawful Sexual Relations Act, 18 U.S.C. § 2423(a), Batton appeals, raising three trial errors.

Batton contends the district court erred when it: (1) admitted evidence of a past conviction of a sexual offense against a fourteen-year-old family friend; (2) gave an improper jury instruction regarding the relevancy of the prior sexual assault; and (3) allowed an expert witness to testify regarding the methods sex offenders use to recruit and groom victims.

Having jurisdiction pursuant to 28 U.S.C. § 1291, we find the district court did not err. The evidence of Batton's prior sexual assault against a fourteen-year-old boy was strikingly similar to the charged offense and helped the jury determine the validity of the victim's accusations; the jury instructions as a whole were not misleading; and the expert testimony explained the characteristics and techniques of sex offenders in a way helpful to the jury.

Accordingly, we AFFIRM Batton's conviction.

## I. Background

Trial testimony shows Batton's interaction with the victim began several years before the crime occurred. In 2000, the victim's parents moved to Douglas, Wyoming, with their two sons. They purchased a townhouse, and their neighbors

were William Batton, his wife, Liz, and Liz's son.  The two families formed a solid friendship, and over the next two years, they spent a great deal of time together, including holidays.  The victim's mother often spoke with both Batton and his wife about day-to-day life, as well as more personal matters.

Some time in 2002, the victim's parents moved 30 miles west of Douglas to Glenrock, Wyoming.  The parents then went through a divorce.  During and after the divorce, the Battons continued to have a close friendship with the victim's mother and her children.  In particular, the Battons maintained regular contact with the mother's eight-year-old son, J.D., who seemed especially troubled by his parents' separation.  Batton suggested to J.D.'s mother that it might benefit J.D. to get away on occasion from the circumstances surrounding his parents' divorce, and he asked for permission to spend time with J.D. every once in a while.  The mother agreed.

Over the course of several years, Batton and his wife took J.D. to the movies, the state fair, dinner, and their places of employment.  J.D. also spent the night at the Battons' house on several occasions.  During the summer of 2006, Batton told J.D.'s mother that he wanted to reward J.D. for earning good grades by taking him on a trip to the Black Hills in South Dakota.  The mother consented, and J.D. traveled with Batton and his wife to South Dakota, where they visited monuments and explored various sights.

From 2006 to 2007, J.D.'s mother and her children regularly met with the Battons. J.D. continued to do well in school, and Batton once again offered to take J.D. on a congratulatory trip, this time to Chicago. Batton's wife and her business partner would be attending a conference, and Batton wanted to bring J.D. along, hoping to take him to various sights in the city while his wife attended her meetings. J.D.'s mother again agreed, feeling J.D. would enjoy the trip, especially since he had never been to Chicago.

In late July, 2007, Batton, his wife, her business partner, and J.D. traveled to Chicago, returning a week later. J.D.'s mother thought nothing of the trip until January, 2008, when Batton called her and informed her, for reasons that are not clear, that he had been in prison the previous weekend for failing to register as a sex offender. Although Batton tried to convince J.D.'s mother that it was nothing of consequence and that a family in Ohio was merely trying to extort money from him because of something that had happened long before, J.D.'s mother decided not to allow Batton to visit with J.D. in the future unless she or her fiancé were present.

Several days later, her worries still lingering, J.D.'s mother searched on-line for information relating to Batton and his Ohio offenses. What she found disturbed her: a number of newspaper articles detailing Batton's 1995 conviction for sexual assault on a 14-year-old boy. She immediately left work and drove to J.D.'s school, where she pulled him from class. She drove J.D. home, explained

that Batton had been in trouble, and asked J.D. if Batton had ever touched him in a sexual way. J.D. answered in the affirmative.

After conferring with her fiancé, J.D.'s mother phoned the Converse County Sheriff's Office to report what J.D. had told her. That phone call resulted in an investigation, which eventually led to Batton's prosecution.

At trial, J.D. testified that Batton had touched his genitalia on a number of occasions from the time J.D. was in second grade until he finished sixth grade. He also testified that on the second and third days of the Chicago trip, Batton had engaged in sexual contact with him.

Over Batton's objections, the trial court allowed the jury to hear (1) evidence of Batton's 1995 Ohio conviction, including testimony from the victim in that case; (2) Instruction 36, which read, in part, that the government "offered [the evidence regarding the 1995 conviction] for its bearing on any matter to which it is relevant, including . . . the improbability that the Defendant has been falsely or mistakenly accused of these crimes," R., Vol. I, Doc. 68 at 39; and (3) testimony from Dr. Heineke, the government's expert who testified regarding the general methods of sex offenders.

## II. Discussion

Batton appeals his conviction and charges the trial court erred in admitting the prior crime's evidence, the jury instruction, and the expert testimony. We discuss each in turn.

### A. *Batton's 1995 Conviction*

#### 1. The Applicability of Rule 413

Batton first contends the district court erred in admitting evidence of his 1995 conviction in Ohio. We review legal interpretations of the Federal Rules of Evidence de novo. *United States v. Guardia*, 135 F.3d 1326, 1328 (10th Cir. 1998). Evidentiary rulings are reviewed for an abuse of discretion, which means we will not disturb the district court's ruling "absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *United States v. Stiger*, 413 F.3d 1185, 1194 (10th Cir. 2005) (quotations omitted).

The district court admitted the evidence of the 1995 conviction under Federal Rule of Evidence 413, which addresses propensity evidence in the context of sexual assault. *See United States v. Benally*, 500 F.3d 1085, 1089 (10th Cir. 2007). In general, the rules of evidence prohibit "the admission of evidence for the purpose of showing a defendant's propensity to commit bad acts." *Id.; see* FED. R. EVID. 404(a).

But Rule 413 provides an exception: "In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant." FED. R. EVID. 413(a). To establish admissibility under Rule 413, the prosecution must

show (1) the defendant is currently accused of an offense of sexual assault; (2) the proffered prior acts evidence is "of the defendant's commission of another offense of . . . sexual assault," FED. R. EVID. 413(a); and (3) the proffered evidence is relevant. *See Guardia*, 135 F.3d at 1328 (10th Cir. 1998).

Rule 413 defines "an offense of sexual assault" as, among other things, (1) "contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person," FED. R. EVID. 413(d)(2); (2) "an attempt or conspiracy to engage in [such] conduct," FED. R. EVID. 413(d)(5); or (3) "any conduct proscribed by [18 U.S.C. §§ 2241–2246]."[1] FED. R. EVID. 413(d)(1). 18 U.S.C. §§ 2241–2246, in turn, prohibits any conduct proscribed in an enumerated series of sexual assault crimes.

Just as Rule 413 permits the introduction of prior offenses of sexual assault evidence, Rule 414 similarly allows the admission of evidence of prior offenses in child molestation cases. As we noted in *United States v. Enjady*, 134 F.3d 1427 (10th Cir. 1998), Congress enacted these rules because these types of cases often raise questions regarding the victim's credibility and a defendant's prior conduct can be especially probative. *Id.* at 1431. Additionally, the rules are "based on the premise that evidence of other sexual assaults is highly relevant to prove propensity to commit like crimes." *Id.*

---

[1] The text of Rule 413(d)(1) reads, "any conduct proscribed by Chapter 109A of title 18, United States Code," which is codified in 18 U.S.C. §§ 2241–2246.

The district court properly concluded that both Batton's prior conviction and the crime with which he is charged in this case qualify as sexual assault for Rule 413 purposes. Because 18 U.S.C. § 2243 clearly proscribes the conduct that led to Batton's 1995 conviction—oral sex with a fourteen year old boy—the conviction meets Rule 413's definition of a sexual assault. Section 2243(a) provides:

> Whoever . . . knowingly engages in a sexual act with another person who–(1) has attained the age of 12 years but has not attained the age of 16 years; and (2) is at least four years younger than the person so engaging; or attempts to do so, shall be fined under this title, imprisoned not more than 15 years or both.

18 U.S.C. §2243(a). The statute defines a "sexual act" as "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to . . . arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(2)(D). Batton was charged and convicted in Ohio of engaging in prohibited sexual acts with a 14-year-old family friend whom he had known for many years. His underlying conviction thus falls squarely under Rule 413's definition of a sexual assault.

Similarly, the charge against Batton in this case also qualifies as an offense of sexual assault for Rule 413 purposes. Batton is charged with knowingly transporting J.D. across state lines with the intent of engaging in illicit sexual activity. The illicit sexual activities involving genital contact, which J.D. testified took place in Chicago, clearly fit the conduct described in § 2243(a),

-8-

qualifying the activity as a sexual assault pursuant to Rule 413. *See* FED. R. EVID. 413(d)(1). Moreover, the charged sexual activity also meets Rule 413's internal definition of sexual assault, which is "contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person."[2] FED. R. EVID. 413(d)(2).

Batton makes two arguments against the application of Rule 413. First, he contends the offense with which he is charged—transporting a minor in interstate commerce with the intent to engage in illicit sexual activity—does not have as an element the conduct contemplated by Rule 413 and therefore the rule does not apply. Second, he contends the district court improperly conflated the standards of Rule 414 in its analysis of Rule 413. We disagree with both arguments.

The first contention fails because Rule 413(d)(5) provides that sexual assault includes not only the conduct described above but also any "attempt or conspiracy to engage in [such] conduct." *Id.* Defendants need not, therefore, complete sexual acts before their conduct constitutes a sexual assault for Rule 413 purposes. Our case law supports this result. In *United States v. Meacham*, 115 F.3d 1488 (10th Cir. 1997), for example, we approved the district court's decision

---

[2] Federal law sets the age of consent at 16, which means J.D. was legally incapable of consenting to the sexual activity. *United States v. Lopez-Deleon*, 513 F.3d 472, 474–75 (5th Cir. 2008), *cert. denied* 128 S. Ct. 2916, 171 L.Ed.2d 851 (2008). This is true "'regardless of whether'" the sexual activity was "'against [J.D.'s] will.'" *Id.* at 475 (quoting BLACK'S LAW DICTIONARY 1288 (8th ed. 2004)).

to allow into evidence a past conviction for child molestation in a case in which the charge was identical to that against Batton in this case. *Id.* at 1495. There, the defendant faced charges of transporting a girl between the ages of eight and ten between state lines with the intent to engage in sexual activity. *Id.* at 1491. The district court admitted evidence that the defendant had molested his two stepdaughters thirty years before when they were young girls. *Id.* We upheld the district court's decision, noting that Rules 413 and 414 permit prior act evidence in such a case. *Id.* at 1495. Because the charge against Batton is identical to that in *Meacham*, the decision there supports the admission of Batton's prior conviction.

Batton's second contention is likewise unpersuasive. Both Rule 413 and Rule 414 serve the same purpose—to provide exceptions to Rule 404(a)'s prohibition on the admission of propensity evidence. Rule 413 applies to offenses of "sexual assault," whereas Rule 414 applies to offenses of "child molestation." The two rules use similar definitions for their respective offenses, but Rule 414 limits itself to acts committed against children under the age of 14. Rule 414 also includes in its definition of child molestation the offenses involving child pornography in Chapter 110 of the federal criminal code. Batton argues Rule 414's definition of "child molestation" is broader than Rule 413's definition of "offense of sexual assault." He then appears to imply the district court improperly applied Rule 414's broader definition when it concluded that Rule 413

should apply in this case.  This argument fails because, as explained above, Batton's conduct meets Rule 413's definition of sexual assault regardless of Rule 414's definition of child molestation.  The district court did not rely on Rule 414's definition of child molestation when it determined Rule 413 applied in this case, and thus it did not err.

Finally, we agree with the district court that the evidence of Batton's 1995 conviction is relevant.  Despite the passage of time, the similarities between the victims and the conduct in each of the cases is striking—they fully support a pattern of grooming[3] and assaulting young male victims.

### 2. Rule 403's Balancing Test

Yet the analysis does not end with Rule 413.  Evidence admitted pursuant to Rule 413 is still subject to Rule 403's balancing of probative value and prejudice.  *See United States v. Castillo*, 140 F.3d 874, 884 (10th Cir. 1998). Under the required balancing test, a district court may nonetheless exclude that evidence "if its probative value is *substantially outweighed* by the danger of unfair prejudice" to the defendant.  FED. R. EVID. 403 (emphasis added).  In general, the district court must consider "1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to

---

[3] The term "grooming" is the process whereby a sex offender earns the trust and confidence of a victim before engaging in a sexual act.  Sana Loue, *Legal and Epidemiological Aspects of Child Maltreatment*, 19 J. LEGAL MED. 471, 479 (1998).

prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence." *United States v. Enjady*, 134 F.3d at 1433.

More specifically, in assessing the *probative value* of the evidence, the court must consider "(1) the similarity of the prior acts and the charged acts, (2) the time lapse between the other acts and the charged acts, (3) the frequency of the prior acts, (4) the occurrence of intervening events, and (5) the need for evidence beyond the defendant's and alleged victim's testimony." *Benally*, 500 F.3d at 1090–91. The court assesses the *prejudicial dangers* by considering "1) how likely is it such evidence will contribute to an improperly-based jury verdict; 2) the extent to which such evidence will distract the jury from the central issues of the trial; and 3) how time consuming it will be to prove the prior conduct." *Enjady*, 134 F.3d at 1433 (citations omitted).

The district court did not err in this balancing. First, the prior act the government tried to introduce is neither speculative nor unclear. It is a prior conviction, already established through the adversary process. Second, its probative value lies in its ability to show Batton has a propensity for grooming and sexually assaulting teenage boys. Indeed, the prior crime's similarity to what J.D. alleged is obvious. Third, Batton claimed at trial that he did none of the acts of which J.D. accused him, making the 1995 conviction a crucial piece of evidence to help the jury determine the validity of J.D.'s accusations.

-12-

Regarding the evidence's probative value, we have already noted how similar the prior incident is with the charged acts in this case. We also recognize the remoteness in time of the prior crime must weigh in the calculus. We spoke to this in *Meacham*, emphasizing, "[s]imilarity of prior acts to the charged offense may outweigh concerns of remoteness in time." 115 F.3d at 1495. In this case, the similarity of the two incidents is so obvious the intervening years are not sufficient to dilute the probative value of the prior act evidence. Further, no intervening acts occurred between the prior incident and the Chicago incident that militate against the government introducing the prior act. Finally, the government needed little evidence, time, or resources to show what happened in the prior crime.

Regarding the evidence's prejudicial effect, the trial court clearly instructed the jurors that they were not to find guilt in this case based on prior convictions. The 1995 conviction evidence therefore did not contribute to the jury's reaching an improperly based verdict. Our review of the record also confirms that the testimony regarding the prior incident was not so time consuming that it risked distracting the jury from the central issue at trial.

In sum, the probative value of the proffered evidence outweighs the danger of unfair prejudice to Batton. The district court did not err in admitting the evidence of Batton's 1995 conviction.

### B. Jury Instruction 36

Batton next argues the district court erred in giving Instruction 36 to the jury. We review de novo the jury "instructions as a whole and view them in the context of the entire trial to determine if they 'accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case.'" *United States v. Bedford*, 536 F.3d 1148, 1152 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 1359, 173 L.Ed.2d 620 (2009) (quoting *United States v. Crockett*, 435 F.3d 1305, 1314 (10th Cir. 2006)). We review "the district court's decision to give or to refuse a particular jury instruction for abuse of discretion." *Id.*

Jury Instruction 36 states in full:

> You are instructed that evidence of conduct by the Defendant, on a previous occasion with witness [name omitted], has been offered by the Government *for its bearing on any matter to which it is relevant, including the Defendant's disposition or propensity to commit the offense that is charged in the Indictment and the improbability that the Defendant has been falsely or mistakenly accused of these crimes*.

> It is entirely up to the jury to determine what weight, if any, such "other conduct" evidence deserves. In reaching your conclusion, you may consider all of the surrounding facts and circumstances of such testimony and give it such weight as you think it is entitled to receive in light of your experience and knowledge of human affairs.

> However, you are cautioned that the Defendant is not on trial here for any acts or crimes not alleged in the Indictment. The Defendant may not be convicted of the crimes charged in the Indictment if you were to find only that he committed other crimes at some other time. You are reminded that, at all times, the Government bears the burden of proving beyond a

reasonable doubt that the Defendant committed the offense charged in the Indictment.

(Emphasis added.)

Focusing solely on the first paragraph, Batton contends the last clause describing "the improbability that the Defendant has been falsely or mistakenly accused" erroneously states the law. He argues it creates a "mandatory inference" instruction to the jury because it implies the prior offense evidence makes it improbable that Batton has been falsely or mistakenly accused of the current crime. *See Sandstrom v. Montana*, 442 U.S. 510 (1979) (condemning mandatory inferences or presumptions in jury instructions). In his view, the clause creates a mandatory presumption of guilt and thus invades the province of the jury.

When read in context, the final clause of the first paragraph of the instruction does not create a mandatory inference or presumption of guilt. Rather, it informs the jury as to why the government proffered evidence of the 1995 conviction and clarifies the evidence may have some bearing on the improbability the government falsely or mistakenly accused Batton of the charged offense. The paragraph does not indicate in any way that the jury must use the evidence to conclude Batton was guilty of the alleged crimes.

Still, even if the first paragraph alone created any confusion in the jurors' minds, the second and third paragraphs would have erased it. They emphasize with clarity that the jury must decide what weight to give the evidence and that no

-15-

matter what other crimes Batton may have committed, the jury must find him guilty of the crime alleged in this case. They further emphasize that the burden of proving guilt beyond a reasonable doubt rests on the government at all times. These clarifying instructions remove any concern we might have that the jury misinterpreted the last clause of the first paragraph.

The district court did not err when it offered Instruction 36 to the jury.

### C. Expert Testimony

Finally, Batton contends the district court erred in allowing the testimony of Dr. William Heineke, the government's expert witness. We review "de novo the question of whether the district court employed the proper legal standard and performed its gatekeeper role in admitting expert testimony." *United States v. Rodriquez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006) (citations omitted). We review for abuse of discretion the district court's actual "application of this standard in deciding whether to admit or exclude an expert's testimony." *Id.* The district court retains broad discretion in assessing an expert's reliability, and we reverse only if the district court's conclusion is "arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003) (quotations omitted).

Prior to allowing the testimony of Dr. Heineke, the trial court held a *Daubert* hearing to determine his qualifications and the reliability of his proposed testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) (requiring district courts to determine whether experts are qualified and reliable). After hearing arguments from both Batton and the government and after considering testimony on Dr. Heineke's experience and qualifications, the trial court ruled that Dr. Heineke had extensive expertise regarding sex offenders and their victims because of his long clinical career in treating both and by virtue of his research in the area. R., Vol. III, Doc. 97 at 49–50. The district court concluded it would allow Dr. Heineke to testify, but only about the characteristics of sex offenders and their victims to dispel any of the jurors' misconceptions that the only people who commit sexual offenses are strangers, not trusted family members or friends. *Id.* at 50. The trial court emphasized that Dr. Heineke was not to offer any opinions about how his testimony might relate to the facts of Batton's case, nor was he to offer any opinions about the credibility of witnesses. *Id.* at 93.

Batton argues that even with those limitations in place, Dr. Heineke's testimony was nothing more than improper "profile" evidence. Batton contends the testimony did nothing but frame the way the jury saw the evidence that followed and how it perceived Batton.

We disagree. We have previously allowed testimony regarding criminal methods that are beyond the common knowledge of lay jurors. "Expert testimony is properly admitted if the subject matter is closely related to a particular profession, business or science and is not within the common knowledge of the average layperson." *United States v. Kunzman*, 54 F.3d 1522, 1530 (10th Cir. 1995). *See United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991) (allowing an expert to testify regarding the specific practices of the drug trade, about which lay jurors might have misconceptions). Our reasoning for this is rooted in Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form on an opinion or otherwise.

Thus, we have declined in the past to classify "evidence into categories of profile or non-profile." *McDonald*, 933 F.2d at 1522. Rather, we have focused our inquiry on whether the "specialized knowledge . . . will assist the trier of fact in understanding the evidence." *Id.*

Dr. Heineke testified that sex offenders are generally not strangers to their victims and their families but are more often than not close family members, friends, or well-respected individuals in a community who often use their positions to groom their victims into trusting them. He also informed the trial court that many lay persons carry a common misconception that sex offenders are

only strangers or fit some misconceived criminal caricature.  This specialized

information may very well be beyond the knowledge of many jurors.  *See* Robin

Fretwell Wilson*, Undeserved Trust: Reflections on the ALI's Treatment of De

Facto Parents*, *in* RECONCEIVING THE FAMILY: CRITIQUE OF THE AMERICAN LAW

INSTITUTE'S PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION*,* 90, 117–118

(Robin Fretwell Wilson, ed., 2006) (showing that many of the behaviors legal

doctrines equate with good parenting are the same behaviors used by child

molesters to groom their victims, including reading to children and bathing,

dressing, disciplining, and showering children with attention and gifts); Jon R.

Conte, *The Nature of Sexual Offenses Against Children*, *in* CLINICAL APPROACHES

TO SEX OFFENDERS AND THEIR VICTIMS (Clive R. Hollin & Kevin Howells eds.,

1991) (explaining many of the techniques sex offenders use to groom their

victims).

Other circuits have reached a similar conclusion.  For example, in *United

States v. Romero*, 189 F.3d 576 (7th Cir. 1999), the Seventh Circuit held that

contemporary expert testimony regarding the modus operandi of child molesters

was admissible.  *Id.* at 585–87.  In *Romero*, the defendant was charged with

kidnaping and transporting a minor with the intent to engage in criminal sexual

activity.  The trial court allowed expert testimony regarding the practices of child

sex abusers to dispel "from the jurors' minds the widely held stereotype of a child

molester as a 'dirty old man in a wrinkled raincoat' who snatches children off the

street." *Id.* at 584. The Seventh Circuit approved the trial court's decision, noting that the expert testimony showed the sex abusers' grooming techniques. *Id.* at 585. Most notably, the testimony "illuminated how seemingly innocent conduct such as [the defendant's] extensive discussions . . . [with his victim] . . . could be part of a seduction technique." *Id.*

Similarly, the Fifth Circuit in *United States v. Hitt*, 473 F.3d 146 (5th Cir. 2006), held that the admission of expert testimony regarding the modus operandi of child molesters, including grooming, was not an abuse of discretion. *Id.* at 158. As in other cases we have discussed, in *Hitt*, the defendants were charged with transporting a minor across state lines for the purpose of engaging in illicit sexual activity. *Id.* at 150. The defendants argued that such expert testimony was inappropriate character evidence and should not have been admitted. *Id.* at 158. The Fifth Circuit rejected that argument, noting that several other circuits also allowed testimony regarding the grooming methods of sex offenders. *Id.* (citing *United States v. Hayward*, 359 F. 3d 631, 636–37 (3d Cir. 2004) (holding that expert testimony regarding the grooming techniques of child molesters was admissible)).

We do not find the trial court abused its discretion in concluding the jurors would benefit from learning of the modus operandi of sex offenders. The methods sex offenders use are not necessarily common knowledge. The trial court held a thorough *Daubert* hearing, where the parties discussed at length Dr.

Heineke's qualifications. The record supports the trial court's determination that Dr. Heineke had sufficient expertise to discuss how sex offenders prepare their victims. Further, the trial court was careful to limit Dr. Heineke's testimony to only the correction of possible juror misconceptions regarding how sex offenders behave and what they look like. With those limitations in place, the trial court was well within its discretion to allow Dr. Heineke's testimony.

## III. Conclusion

Because we find the district court did not err in admitting evidence of the 1995 conviction, in instructing the jury, or in allowing Dr. Heineke's testimony, we AFFIRM Batton's conviction.