**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

WYATT PENTZ WOOLSEY,

        Defendant - Appellant.

No. 14-8067
(D.C. No. 2:11-CR-00015-NDF-1)
(D. Wyo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **MATHESON**, **O'BRIEN**, and **PHILLIPS**, Circuit Judges.

---

Wyatt Woolsey violated the conditions of his supervised release, his second. As a result he was sentenced to imprisonment followed by another period of supervised release, his third.[1] A special condition of the renewed release required him to reside in a

---

[*] The parties have waived oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). This case is submitted for decision on the briefs.

This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

[1] The first felony in this criminal odyssey was for possession of a firearm with an

(Continued . . . )

halfway house for the first six months.[2] He objected and now seeks our review of the halfway house condition, claiming it is unnecessary, because he has the means to rent an apartment, and therefore improper.[3] In affirming, we pause to applaud the district judge's refusal to tolerate persistent manipulation, deceit, and criminal behavior.

## I. BACKGROUND

In March 2011, Woolsey pled guilty to being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He was sentenced to 24 months imprisonment followed by a 3-year term of supervised release. As part of the conditions of his supervised release, he was prohibited from possessing or using alcohol, controlled substances, drug paraphernalia, and dangerous weapons. He was also required to notify the probation officer of any change in residence and to obtain the officer's permission prior to leaving the judicial district (Wyoming). His release was further conditioned on

---

obliterated serial number. He was sentenced by a federal court in Utah to 21 months imprisonment. After serving the sentence of incarceration, he was admitted to supervised release. According to the record, he was manipulative and frequently non-compliant with the conditions of his release. In spite of frequent violations, he avoided revocation; mostly because he "manage[d] to maintain steady employment." (R. Vol. 2 at 8.)

[2] The district judge and probation officer used the term "Residential Re-Entry Center." (R. Vol. 1 at 31; Vol. 2 at 22.) Since both parties use the term "halfway house" in their briefs, we do the same. It appears Woolsey has completed the prison portion of his sentence and is now residing in a halfway house. See http://www.bop.gov/inmateloc/ (last visited March 30, 2015).

[3] Woolsey filed his notice of appeal the same day the district judge's order revoking supervised release and imposing sentence was entered on the docket sheet. No separate judgment was entered nor was one necessary. The court's order was complete and, for this type of case, final.

committing no federal, state or local offense.[4]

Woolsey began serving supervised release on October 18, 2012. He was permitted to live with his mother. However, it became "rapidly apparent" to the probation officer he was not residing there: "Despite [the] officer's tenacious attempts to locate him at home at virtually all hours of the day and night, his whereabouts could not be [con]firmed. The fact that his mother repeatedly told this officer the defendant was living with her but frequently came from and went to locations she was not aware of made efforts to supervise [Woolsey] ineffective . . . . For months on end, [Woolsey] could not be located, leaving the probation officer to conclude he was avoiding supervision outside of scheduled office visits." (R. Vol. 2 at 22.) It was not until September 2013, when the probation officer threatened to place him in a halfway house, that Woolsey finally came clean—he was living with his new girlfriend and he did not want her to know he was a convicted felon. The probation officer agreed not to take any formal action against him if he told his girlfriend the truth. Woolsey did so and the officer viewed this as a "turning point" for him as "he appeared to be more forthcoming with [the] officer, his attitude became one of cooperation, and he seemed to be settling into compliance." (R. Vol. 2 at 22.) Unfortunately (but not surprisingly), his epiphany was short lived.

---

[4] Due to twice testing positive for consuming alcohol, Woolsey's conditions of supervised release were modified in May 2013 to require him to enroll in Interactive Journaling, a cognitive behavioral treatment program. It was the "hope[]" of the probation officer that such program would allow Woolsey to "develop better decision-making skills" thereby helping him to avoid future violations. (R. Vol. 1 at 20.) **[V.1 at 20-21]**

On September 7, 2014, Woolsey's girlfriend called the police after finding 1.6 grams of cocaine he had brought into her house. He came clean with the police: the cocaine belonged to him and he had used some earlier in the day. Searches by the police and probation officer uncovered a methamphetamine pipe, alcohol, an illegal switchblade knife, a set of throwing stars, and a sword. Woolsey admitted to having used the pipe to smoke methamphetamine earlier that day and that the remaining items were his. He had also traveled to Colorado that day without first obtaining permission from his probation officer.

The probation officer submitted a petition to revoke supervised release, alleging five violations. He admitted to all five. The advisory guideline range was 6 to 12 months imprisonment. In her report to the court, the probation officer recommended 6 months imprisonment to be followed by 30 months of supervised release, with the first 6 months of supervised release to be served at a halfway house. She reasoned:

> A sentence at the low-end of the guideline range is recommended, as it will serve to adequately hold the defendant accountable for his noncompliant conduct, which when viewed collectively, indicates a person who only grudgingly and marginally chose to comply, insofar as outward appearances were concerned. Behind the scenes, the defendant has been secretive, dishonest, and defiant, choosing to do as he wished rather than what was required of him by this Court, let alone what was best for him. This is a difficult personality to treat and work with, and because of these things, the defendant has damaged his relationships with both his family and his girlfriend, leaving him without a residence. As such, the probation officer recommends that upon release from imprisonment, the defendant be placed in a [halfway house] for a period of six months in order to work and save toward establishing his own residence within the community.

(R. Vol. 2 at 23.)

At the dispositional hearing, she reiterated her recommendation of 6 months

- 4 -

imprisonment due to Woolsey's "willful decisions to violate supervision" and the concealment of "his whereabouts for a great number of months" with the help of his family. (R. Vol. 3 at 21.) She also said she was "most concerned [with] what will occur with him after he's released from custody. At this point he doesn't have anywhere to go. He has -- at least for this time being does not have the support of his family. They are not willing to have him live with them at this point. And his . . . girlfriend with whom he was living is not going to permit him to return to the home." (R. Vol. 3 at 22.) Because "he will be starting over upon his release," the officer again recommended Woolsey serve the first 6 months of supervised release at a halfway house. (*Id.*) The government agreed with the probation officer's recommendation.

For his part, Woolsey blamed his problems on his use of alcohol, which "got really bad" when his mother's cancer worsened. (R. Vol. 3 at 24.) Although the help he was offered to deal with his substance abuse (*see supra* n.4) apparently failed, he did nothing to obtain additional help while on supervised release. At the dispositional hearing he argued for treatment rather than prison. He also claimed to have money from two paychecks ($3,400) to rent an apartment and said his mother had agreed to help him find an apartment and provide financial assistance if necessary.

The probation officer viewed Woolsey's treatment request as simply "a means of avoiding punishment." (R. Vol. 3 at 31.) The district judge agreed. She was unsympathetic to Woolsey's attempt to deflect blame for his behavior:

[I]t is a difficult case. On the one hand, . . . you have been working full time at a good job . . . . [S]o we've got . . . someone who is . . . high performing in terms of being able to work and have a good job.[5]

And then on the other side we have deceptive conduct . . . . [F]or whatever reason, your mother was lying for you. She was lying for you, and so you've implicated her . . . as an enabler one way or another.

[The probation officer] gave you a huge second chance, and everything seemed to be working out reasonably well until this situation. And so, honestly, I have a difficult time seeing that your whole life is ruled by alcohol. I see an impulsive person who has skills and talents, but also has a fascination with weapons, has a bad attitude toward women, and has concededly or admittedly a problem with alcohol.

And so you had the best break you could have ever hoped for by not being brought before the Court and what do you do? You smoke methamphetamine. You were found . . . in possession of cocaine. You've got alcohol that you admitted belongs to you. You've got dangerous weapons which you shouldn't have. And you know that. You're not a stupid person.

For me, this whole . . . schematic of performing person doesn't yell out you need treatment. It yells out you need consequences. You need . . . the wake-up call that [the probation officer] gave you the first time and you completely . . . turned your back on that opportunity and fouled the nest that you had with [your girlfriend] and the one at your mother's house, and now she's looking at terminal cancer.
                    . . . .

So, I agree with the probation officer's recommendation that . . . time in custody is appropriate. There will be time on supervision. And if through that process either at the [halfway house] or later perhaps we can get a sense of what among this complex set of traits you have, really positive traits and then very troubling traits—what can we do to mitigate the troubling traits from causing you to self-destruct.

(R. Vol. 3 at 33-35.)

Sentencing followed.

_____

[5] His decent work ethic saved him in the past. *See supra* n.1.

## II. DISCUSSION

According to Woolsey the halfway house condition is substantively unreasonable. Reasonableness is, indeed, the watchword in our review of most sentencing decisions, even those made after revocation of supervised release. *See United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009); *United States v. Steele*, 603 F.3d 803, 807 (10th Cir. 2010) (the "reasoned and reasonable" standard of review applicable to review of sentences following revocation of supervised release is equivalent to reasonableness review under *United States v. Booker*, 543 U.S. 220 (2005)). Although our review of special conditions has a reasonableness component focused on several of the § 3553(a) factors, *see infra* 18 U.S.C. § 3583(d), the standard of review is abuse of discretion.[6] *United States v. Mike*, 632 F.3d 686, 691 (10th Cir. 2011). "[W]e will not disturb the district court's ruling absent a showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment."[7] *United States*

---

[6] Our discussion of the two standards of review (reasonableness versus abuse of discretion) is perhaps a distinction without a difference. *See Gall v. United States*, 552 U.S. 38, 46 (2007) ("Our explanation of 'reasonableness' review in the *Booker* opinion made it pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions."); *Rita v. United States*, 551 U.S. 338, 351 (2007) ("[A]ppellate 'reasonableness' review merely asks whether the trial court abused its discretion . . . ."); *United States v. Lucero*, 747 F.3d 1242, 1246 (10th Cir. 2014) (stating sentences are reviewed "under an abuse of discretion standard for procedural and substantive reasonableness.") (quotations omitted).

[7] The government claims the more rigorous plain error standard applies because Woolsey did not object when the halfway house condition was imposed. *See Mike*, 632 F.3d at 691 (applying plain error review where defendant did not object to special condition of supervised release at time it was imposed). Woolsey disagrees. He says he adequately objected to the halfway house condition by reporting he had the means to live

(Continued . . . )

*v. Batton*, 602 F.3d 1191, 1196 (10th Cir. 2010) (quotations omitted).

Section 3583(d), in conjunction with 18 U.S.C. § 3563(b)(11), allows commitment to a community corrections facility to be a condition of supervised release. And, again, reasonableness is the watchword. District courts enjoy broad discretion in imposing special conditions of supervised release, but "[that] discretion is not without limits." *Mike*, 632 F.3d at 692. Under § 3583(d), such conditions must (1) "be reasonably related to at least one of [the] following: the nature and circumstances of the offense, the defendant's history and characteristics, the deterrence of criminal conduct, the protection of the public from further crimes of the defendant, and the defendant's educational, vocational, medical, or other correctional needs"[8]; (2) "involve no greater deprivation of liberty than is reasonably necessary to achieve the purpose of deterring criminal activity, protecting the public, and promoting the defendant's rehabilitation"; and (3) "be consistent with any pertinent policy statements issued by the Sentencing Commission." *Id.*

The halfway house condition imposed here more than satisfies all three requirements. First, it is reasonably related to Woolsey's history, characteristics, and correctional needs and serves to deter future criminal conduct. Woolsey was often non-compliant with the terms of his first conditional release order, *see supra* n.1, and he

in his own apartment. We need not resolve the debate. Woolsey cannot prevail even under the abuse of discretion standard.

[8] These factors derive from 18 U.S.C. § 3553(a)(1), (2)(B), (2)(C) and (2)(D). *See* 18 U.S.C. § 3583(d)(1).

upped the ante in this case. He consistently lied to his probation officer for over a year as to where he was living. His supervised release was revoked due to his possession of prohibited items (including contraband) and leaving the judicial district without permission. Residence at a halfway house will assist the probation officer in monitoring Woolsey's whereabouts, impede his possession of and contact with contraband, cause him to focus on his substance abuse, and discourage future crimes or violations. It may not be a comfortable experience for him, but for society it will increase the probability of his being held accountable for aberrant behavior during the early days of his third conditional release.

Second, requiring Woolsey to reside at a halfway house for 6 months involves no greater deprivation of liberty than is reasonably necessary. "Special conditions constitute a greater than necessary deprivation of liberty when they infringe upon fundamental liberty interests, such as familial association." *United States v. Begay*, 631 F.3d 1168, 1175 (10th Cir. 2011). Short-term residence at a halfway house "does not rise to this level." *Id.* Distancing Woolsey from corrupting or enabling peers (including family members) is good reason for the modest restraints a halfway house may temporarily entail. While it will prevent Woolsey from coming and going as he pleases (one of the obvious triggers leading to his current circumstances), nothing in the record suggests how it will prevent him from working or having contact with his family, albeit monitored.

Finally, the condition is consistent with the Sentencing Commission's pertinent policy statements. USSG §5D1.3(e)(1) states "[r]esidence in a . . . halfway house . . . may be imposed as a [special] condition of supervised release." And USSG §5F1.1

provides: "Community confinement may be imposed as a condition of probation or supervised release." It defines "[c]ommunity confinement" to include "residence in a . . . halfway house." USSG §5F1.1, comment. (n.1).

Although the halfway house condition satisfies all three requirements of 18 U.S.C. § 3583(d), Woolsey nevertheless claims the district judge erred in imposing it because it was unnecessary. According to him, that condition was imposed based on the probation officer's assumption he would have no place to live following his release. But, he says, at the dispositional hearing he explained to the judge that he had ability to rent an apartment—with assistance from his mother, if necessary. In light of that he complains of the judge's failure made no specific findings justifying the halfway house condition.

The reason the probation officer gave for recommending the halfway house condition was her concern Woolsey would have nowhere to live upon the completion of his term of imprisonment because he had alienated his family and girlfriend. But, the judge obviously had additional reasons. Her failure to accentuate the obvious is no reason to reverse her decision. Woolsey's long history of resisting supervisory efforts makes the need for a transition from incarceration self-evident. More important, her explanation of the sentence imposed clearly implies that insuring Woolsey had a place to live was not the only, or even the primary, reason for imposing the condition. Finally, and, contrary to Woolsey's assertion, his claim to have $3,400 and the financial assistance and support of his mother did not alleviate the housing concern. While he may have had some money, he did not have a job, making it questionable as to whether he could secure an apartment without a stable income and, even if he could, whether he

could sustain living there without gainful employment. Finally, it is painfully obvious why the probation officer and judge did not to rely on the mother's possible assistance. As the judge aptly noted, her "assistance" in the past mainly consisted of lying for her son for the purpose of enabling his deceptive behavior.[9]

The sentence imposed, including the halfway house condition, amounted to nothing more than a condign consequences for an established pattern of intransigent, oppositional behavior. And it offered the best hope of rehabilitation.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

---

[9] Woolsey complains the judge did not rely on these reasons (no job and mother's deception) in rejecting his claim to have the means to rent an apartment. But the probation officer did state the halfway house condition would allow Woolsey "to work and save toward establishing his own residence within the community." (R. Vol. 2 at 23.) And the judge noted the mother's deception in announcing sentence. In any event, when, as here, "a district court imposes a within-Guidelines sentence, the court must provide only a general statement of its reasons, and need not explicitly refer to either the § 3553(a) factors or respond to every argument for leniency that it rejects in arriving at a reasonable sentence." *United States v. Lente*, 647 F.3d 1021, 1034 (10th Cir. 2011) (quotations omitted).