NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0352n.06

No. 23-5485

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Aug 12, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| v. | ) ) ) | |
| EVERETT MILLER, JR., | ) | |
| Defendant-Appellant. | ) ) | OPINION |
| | ) ) | |

Before: CLAY, McKEAGUE, and READLER, Circuit Judges.

**CLAY, Circuit Judge**. Following a jury trial, Defendant Everett Miller, Jr. was convicted of: (1) enticing and coercing a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b); (2) transporting a minor across state lines with the intent to engage in sexual activity, in violation of 18 U.S.C. § 2423(a); (3) committing those offenses as a sex offender, in violation of 18 U.S.C. § 2260A; and (4) attempting to escape from the custody of an authorized representative of the Attorney General, in violation of 18 U.S.C. § 751(a). On appeal, Miller argues that the district court abused its discretion by denying various motions to subpoena the victim's mental health records, as well as by admitting expert testimony on the "grooming practices" of child sex predators. In addition, Miller argues that the district court violated his Sixth Amendment rights by ordering a partial closure of the courtroom to certain spectators on the first day of trial. For the reasons set forth below, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

### A. Instant Offense

Throughout Defendant Everett Miller's adult life, he has faced multiple prior convictions for sex offenses with minor children. In 1990, Miller pleaded guilty to fondling his nine-year-old stepson. The victim reported that Miller forced him to engage in oral and anal sex. Then, in 2001, Miller was fostering a minor female and used his authority to force her to have vaginal and oral sex with him multiple times. Miller pleaded guilty to the sexual battery of a child, over whom he had parental and custodial authority. In 2006, Miller raped a fifteen-year-old female who was spending the night at Miller's home.

These convictions prohibited Miller, a registered sex offender, from residing with a minor. Nonetheless, in approximately November 2018, Miller permitted his sister-in-law, Miranda Stevens, along with her two minor children, M.E. and H.E., to move in with him and his wife. At the time, Miller and his wife were both working as truck drivers. Miller was aware that Stevens' family was fleeing from her sexually abusive ex-husband in North Carolina, and Miller was further aware that H.E. suffered from mental health issues and was on the autism spectrum.

Miller quickly began to grow close with H.E., buying her various gifts and visiting her room at night. In July 2019, Miller gifted H.E. a cell phone for her sixteenth birthday. Over the course of the next six months, "Defendant Miller and the victim exchanged over 2,900 text messages." PSR, R. 150, Page ID #1605. These text messages ranged from giving H.E. compliments, to professing his love and devotion to H.E., to insisting that he would divorce his wife to marry her. Notably, these text messages did not involve the sharing of nude pictures or any descriptions of sexual activity.

2

On or about December 22, 2019, Miller and his wife took H.E. with them on a truck route from Tennessee to Florida. While Miller's wife returned home from Florida, Miller and H.E. embarked on a second route, traveling alone to New Mexico together. During this time, Miller forced H.E. to engage in sexual intercourse and oral sex. Miller then threatened H.E. and texted her to "[n]ever tell anyone," intimidating H.E. into not telling her mother or authorities. However, H.E.'s mother, Stevens, eventually discovered H.E.'s secret cell phone, along with the thousands of texts between her daughter and Miller. This discovery prompted H.E. to tell Stevens about the rape, and the two reported Miller's actions to the police. Based on the aforementioned conduct, Miller was charged with: (1) enticing a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b); (2) transporting a minor across state lines with the intent to engage in sexual activity, in violation of 18 U.S.C. § 2423(a); and (3) committing those offenses as a sex offender, in violation of 18 U.S.C. § 2260A.

While in custody, on August 14, 2020, Miller underwent a scheduled heart catheter procedure. After the surgery was completed, a nurse and two deputies pushed Miller in a wheelchair to the hospital's car port for transport back to the detention center. When one deputy went to retrieve the car, Miller jumped up from his wheelchair and attempted to flee on foot. Miller "ran approximately 20 feet before stumbling and falling on the curb." PSR, R. 150, Page ID #1605. As a result, Miller was also charged with attempted escape, in violation of 18 U.S.C. § 751(a).

### B. Procedural History

#### 1. Pretrial Proceedings

Miller pleaded "not guilty" on all four counts and proceeded under the theory that H.E. was not credible, was not mentally stable, and lied about the alleged sexual intercourse. To gather evidence in furtherance of his trial theory, Miller filed five *ex parte* motions to subpoena records

3

regarding H.E.'s mental health and H.E.'s reports related to the alleged sexual assault. Miller first moved to subpoena records from the Tennessee Department of Children's Services ("TDCS") and Morgan County Medical Center, contending that their respective interviews with H.E. after the alleged rape would contain relevant and potentially exculpatory evidence. Miller next sought subpoenas for records from various mental health treatment providers—Ridgeview Behavioral Health Services, Trust Point Hospital, and the Youth Villages Operations Center. Miller sought this medical information to bolster his defense theory that H.E.'s mental and physical impairments undermined her credibility. After holding a hearing on the requested subpoenas, the magistrate judge granted Miller's motion for the TDCS and the Morgan County Medical Center subpoenas, but rejected his request for subpoenas related to the three mental health treatment providers, finding that the latter records were protected by the psychotherapist-patient privilege.

Prior to trial, the government informed Miller that it intended to present expert witness testimony from Special Agent Adrienne Isom regarding the common practices and techniques employed by child molesters to "groom" their selected victims for sex. Agent Isom would not offer testimony as applied to the facts of the instant case, but rather would offer expert opinion testimony in the abstract to assist jurors in understanding "grooming." In response, Miller moved to exclude Agent Isom's testimony, arguing that it would not help the trier of fact to understand the evidence and that the testimony was the product of unreliable principles and methods. After conducting a *Daubert* hearing, the magistrate judge denied Miller's motion, finding that the testimony was relevant, reliable, and would assist the jury. Miller appealed the magistrate judge's ruling, and the district court denied his objections based on the magistrate judge's reasoning.

### 2. Trial and Sentencing

On April 11, 2022, Miller's jury trial began. One of the government's first witnesses was H.E.'s mother, Miranda Stevens. During Stevens' testimony, various court officials observed Miller's wife and a woman sitting next to her "gesturing, [] talking, and . . . making facial expressions towards the witness." Trial Tr. Vol. I, R. 190, Page ID #2809–10. One witness described these gestures as "simply intimidation." *Id.* at Page ID #2810. In response, Miller's attorney stated that "Ms. Miller . . . would gladly step out for the rest of this testimony, but she does want to hear . . . the rest of the case." *Id.* Accordingly, for the final few minutes of Stevens' testimony, Miller's wife and her companion were excluded from the courtroom.

During the second day of trial, Mrs. Miller and her companion were permitted to return. The government called Agent Isom to provide expert testimony regarding the techniques employed by child molesters to "groom" minors for sex.[1] Agent Isom had never met Miller or H.E., but instead testified generally to the ways in which child sex offenders often gain access to their victims. For example, Agent Isom testified that groomers often look for vulnerable targets, and often provide gifts or resources for the victim. And, as a child sex offender starts to gain the victim's trust, Agent Isom explained that the predator's interactions with the child may be seemingly innocuous, such as connecting over a certain type of music or struggles in math class. On cross examination, Agent Isom admitted that she was not making an assessment about the instant case, but rather was testifying to help the jury understand grooming behaviors.

---

[1] Agent Isom defined "grooming" as "a dynamic process in which an offender uses a constellation of behaviors to gain the compliance of a child in order to achieve sexual gratification for the offender and/or others." Trial Tr. Vol. II, R. 191, Page ID #2830.

The jury also heard testimony from Leyton Adams, a digital forensic examiner who extracted and reviewed the data from the secret cell phone that H.E. used to communicate with Miller. Adams presented the jury with several of the phone calls and text messages from Miller to H.E., including texts that stated, "I love you and want spend rest of my life," "u are my only friend," "I missing u badly," "u know I like holding you," and "u make me a beautiful wife." Trial Tr. Vol. II, R. 191, Page ID #2906, 2917, 2930, 2933, 2955. The jury then heard from H.E., as well as one of Miller's prior victims, K.O. Both young girls detailed the sexual abuse to which Miller subjected them.

Based on this testimony and evidence, the jury returned a guilty verdict on all four counts. Ultimately, the district court sentenced Miller to a within-Guidelines sentence of life plus ten years' imprisonment. Miller filed a timely notice of appeal.

## II. DISCUSSION

On appeal, Miller challenges two of the district court's pretrial rulings: (1) the district court's denial of Miller's motions for three out of his five requested subpoenas; and (2) the district court's denial of Miller's motion to exclude Agent Isom's expert testimony. In addition, Miller argues that the district court violated his Sixth Amendment right to a public trial when it ordered his wife and her seatmate to leave the courtroom for the remainder of the first day of trial. We consider each argument in turn and find that none have merit.

### A. Rule 17(c) Subpoenas

#### 1. Standard of Review

Prior to trial, Miller sought five subpoenas under Federal Rule of Criminal Procedure 17(c), which "authorizes the issuance of a subpoena for the production of documentary evidence at trial, but is not intended to be used for discovery." *United States v. Justice*, 14 F. App'x 426, 432 (6th

Cir. 2001) (per curiam); *see also United States v. Vassar*, 346 F. App'x 17, 24 (6th Cir. 2009). Once a party invokes Rule 17, the trial court is empowered to quash or modify a subpoena if compliance would be unreasonable or oppressive. Fed. R. Crim. P. 17(c)(2). If the subpoena seeks personal or confidential information about a victim, the subpoena "may be served on a third party only by court order." Fed. R. Crim. P. 17(c)(3). In addition, the party seeking the confidential information must provide notice to the victim, giving the victim the opportunity to move to quash the subpoena.

Because the necessity for a subpoena usually turns on a determination of factual issues, we afford great deference to the district court's judgment. "Without a determination of arbitrariness or that the trial court finding was without record support, an appellate court will not ordinarily disturb a finding" that the applicant for a subpoena complied with or failed to meet the requirements of Rule 17(c). *United States v. Nixon*, 418 U.S. 683, 702 (1974); *see also United States v. Hughes*, 895 F.2d 1135, 1145 (6th Cir. 1990).

## 2. Analysis

As described above, Miller moved the trial court to issue five subpoenas prior to trial, which requested various documents from the governmental entities that had interviewed H.E. and her family, as well as from the medical centers where H.E. previously sought mental health treatment. The magistrate judge, in an order approved by the district court, determined that the requested subpoenas for the records from TDCS and Morgan County Medical Center were reasonable and specific because Miller claimed that these records contained statements from H.E. in January 2020 that directly pertained to her allegations against him. In contrast, the magistrate judge denied the *ex parte* motions for the subpoenas related to Ridgeview, Trust Point, and Youth Villages on the grounds that these records were protected by the psychotherapist-patient privilege.

On appeal, Miller argues that the district court erred by denying these latter three requested subpoenas because any psychotherapist-patient privilege should give way to his right to cross-examine H.E. effectively in accordance with the Sixth Amendment's Confrontation Clause.

To obtain a subpoena under Rule 17, the moving party must show: "(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'" *Nixon*, 418 U.S. at 699–700; *see also Vassar*, 346 F. App'x at 24. In other words, the moving party must show that the sought-after documents meet three requirements: "(1) relevancy; (2) admissibility; [and] (3) specificity." *Nixon*, 418 U.S at 700.

Using these standards, the district court did not act arbitrarily by denying the subpoenas seeking documents from Ridgeview, Trust Point, and Youth Villages on the basis that these records were protected by the psychotherapist-patient privilege. This privilege, which applies to confidential communications between a licensed psychotherapist and her patients, has been recognized by the Supreme Court and this Circuit. *See Jaffee v. Redmond*, 518 U.S. 1, 15 (1996); *In re Zuniga*, 714 F.2d 632, 637–39 (6th Cir. 1983). Neither party disputes that H.E.'s mental health records are covered by the psychotherapist-patient privilege; instead, Miller argues that his right to effectively cross-examine H.E. under the Sixth Amendment should trump H.E.'s privilege. *Cf. Commonwealth v. Barroso*, 122 S.W.3d 554, 563 (Ky. 2003) ("If the psychotherapy records of a crucial prosecution witness contain evidence probative of the witness's ability to recall, comprehend, and accurately relate the subject matter of the testimony, the defendant's right to compulsory process must prevail over the witness's psychotherapist-patient privilege.").

In response, the government encourages this Court to find that the robust psychotherapist-patient privilege is absolute and thus not subject to a balancing test that weighs the defendant's interests against the privilege. Supreme Court precedent could support such a holding. In *Jaffee v. Redmond*, the Supreme Court rejected "the balancing component of the [psychotherapist-patient] privilege" in the context of a civil case, explaining that "[m]aking the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege." 518 U.S. at 17. Various district courts and state courts have extended *Jaffee*'s reasoning to the context of criminal cases and held that the psychotherapist-patient privilege is not subordinate to the Sixth Amendment rights of defendants. *See, e.g.*, *United States v. Sheppard*, 541 F. Supp. 3d 793, 800 (W.D. Ky. 2021) ("[T]he Sixth Amendment provides no grounds to conclude that the Defendants are entitled to access the witnesses' HIPAA-protected and privileged psychotherapy records to aid them in their cross-examination preparations." (quoting *United States v. DeLeon*, 426 F. Supp. 3d 878, 918 (D.N.M. 2019)).

We need not determine whether *Jaffee* extends to criminal cases and thus forecloses any balancing between the privilege and Miller's Sixth Amendment interests. Even assuming some type of balancing test is appropriate where constitutional rights are at stake, Miller's vague and conclusory reasons for seeking these records do not suffice to overcome the psychotherapist-patient privilege. *Cf. Barroso*, 122 S.W.3d at 564 (requiring a defendant seeking privileged psychotherapy records to proffer "evidence sufficient to establish a reasonable belief that the records contain exculpatory evidence"). Without such a showing, the district court properly determined that the records sought from Ridgeview, Trust Point, and Youth Villages were not "evidentiary and relevant." *Nixon*, 418 U.S. at 699. In other words, because Miller failed to

support his motions with reasons that were unrelated to his general desire for impeachment evidence, he has not made the requisite showing to prevail in any potential balancing test.

In particular, the Ridgeview and Trust Point subpoenas sought medical documents from approximately April 2019 and cannot be said to sufficiently relate to the allegations made by H.E. in January 2020. Not only are these records temporally attenuated from the charges that Miller faced, but Miller proffers insufficient reasons for seeking them. Miller's only claim related to the relevancy of the Ridgeview and Trust Point records is that H.E.'s mental health history makes her an unreliable witness. But "the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *Id.* at 701. The trial court also reasonably determined that Miller did not know or specify "what information the various mental health records [would] contain, other than a potential diagnosis of mental illness in 2019." Order, R. 36, Page ID #140. Accordingly, the Ridgeview and Trust Point subpoena requests were not sufficiently specific and were "more in the nature of a 'fishing expedition.'" *Id.*

Although Miller argues that these 2019 records are relevant and specific because H.E.'s mental impairments "affected her ability to perceive reality and recall past events," this conclusory statement regarding relevance does not satisfy *Nixon*'s requirements. Def.'s Reply Br., ECF No. 40, 17; *cf. Commonwealth v. Labroad*, 2 N.E.3d 869, 872 (Mass. 2014) (distinguishing prior case law that denied a defendant's motion for a pretrial subpoena by noting that "the defendant in this case alleged, with particularity, that the complainant's psychological records contained specific information regarding her complaint of sexual assault"); *Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987) (plurality opinion) ("The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony."). Moreover, "[a] person's credibility is not in question

10

merely because he or she is receiving treatment for a mental health problem." *Barroso*, 122 S.W.3d at 563 (citation omitted); *see also United States v. Sampson*, No. 2:21-cr-20732, 2024 WL 180849, at *3 (E.D. Mich. Jan. 17, 2024) (denying Rule 17 motion where "[d]efendant's only basis for requesting these records is a broad generalization that a person's mental health may be relevant to her credibility"). And where Miller has failed to even show that the 2019 records were relevant or specifically identify a valid basis for his request, he has certainly not shown that the psychotherapist-patient privilege should give way to his asserted confrontation rights.

Miller also requested records from Youth Villages that related to H.E.'s psychiatric evaluation on January 27, 2020 after she threatened to commit suicide. This final motion presented a closer call, inasmuch as the mental health records at least post-dated and correlated to the relevant time period of the alleged sexual assault. Based on the temporal proximity to H.E.'s report of her sexual assault, these records clear the low bar for relevancy. Nonetheless, even if we assume that the privilege is subject to a balancing test, the trial court properly concluded that the Youth Villages subpoena did not overcome the psychotherapist-patient privilege because Miller failed to "make some kind of factual showing supporting a reasonable belief that the records will contain inconsistent statements or exculpatory information." Order, R. 98, Page ID #486 (quotation omitted). Indeed, courts that have used a balancing test between the defendant's constitutional rights and the asserted privilege require defendants to do more than merely allege that the materials in question *might* contain pertinent information. *See United States v. Neuhard*, No. 15-CR-20425, 2016 WL 6871454, at *11 (E.D. Mich. Nov. 22, 2016) ("Although some district courts have admitted psychotherapist records when a defendant articulated specific facts pertaining to the high probative value of the records, those are not the facts before this Court."); *Sampson*, 2024 WL 180849, at *5 ("Because Defendant has not set forth any factual basis suggesting the minor

11

victim's mental health records will contain relevant, exculpatory information, or that these records are admissible, he is not entitled to the minor victim's mental health records . . . ."). The trial court therefore did not abuse its broad discretion by recognizing that Miller has failed to assert a specific need for the Youth Villages records and thus failed to overcome the psychotherapist-patient privilege.

Miller provided only two reasons that the Youth Villages medical records were relevant and admissible: (1) "[H.E.'s mother] took [H.E.] to Youth Villages for a psychiatric evaluation 'because [H.E.] threatened to kill herself,'" and (2) that a youth counselor was visiting H.E. for six weeks in 2019. Def.'s *Ex Parte* Memo, R. 34, Page ID #120. But these facts do not tend to indicate that these mental health records would contain any information about the alleged abuse, any inconsistent statements, or any other exculpatory evidence. Instead, Miller speculated that "[i]t is almost certain that statements [related to Miller's abuse of H.E.] were made at the Morgan County medical center, but they *could have* been made at any of the businesses at issue." *Id.* at Page ID #123 (emphasis added). Miller's unsubstantiated contention that relevant statements "could have" been made at Youth Villages is insufficient to override the psychotherapist-patient privilege.

In contrast, Miller's successful subpoena requests fared better because they clearly and specifically indicated why the sought-after records were highly probative. For example, Miller identified specific statements that H.E. made immediately after her police report in January 2020 indicating that she recounted the alleged abuse to her nurses at the Morgan County Medical Center. And Miller's request related to the TDCS records was limited to the records of the January 27, 2020 investigation, which involved interviews of H.E.'s family members that related to the alleged abuse. Where Miller failed to seek H.E.'s mental health records with a similar level of specificity, the district court did not act arbitrarily in denying the motion. Even assuming that the

12

psychotherapist-patient privilege may, in some cases, give way to a defendant's Sixth Amendment rights, Miller has not made the requisite showing in this case.

## B. Expert Testimony on Grooming

### 1. Standard of Review

Miller next challenges the district court's decision to admit Agent Isom's expert testimony on the common techniques of child sex offenders. This Court reviews the district court's decision to admit proposed expert testimony for an abuse of discretion. *See United States v. LaVictor*, 848 F.3d 428, 440 (6th Cir. 2017). "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Osborn v. Griffin*, 865 F.3d 417, 452 (6th Cir. 2017) (citations omitted)).

### 2. Analysis

After receiving notice that the government planned to call Agent Isom to testify to common "grooming" practices among child sex offenders, Miller moved to exclude this expert testimony. Miller argued that the facts presented in the case were not sufficiently complex to warrant the assistance of expert testimony, highlighting that "[t]he jurors have real-life experience with interpersonal relationships, and this experience equates to common knowledge." Def.'s *Daubert* Mot. to Exclude, R. 79, Page ID #319. In addition, Miller contended that the proposed expert testimony was not reliable or relevant, inasmuch as the government failed to provide any proof, data, or statistical information tending to show that the information from Agent Isom qualified as technical or specialized knowledge. And, even if the proposed expert testimony could be viewed as reliable, Miller argued that its potential prejudice substantially outweighed any probative value. Following the parties' briefings, the magistrate judge held a *Daubert* hearing to address Miller's

motion. The magistrate judge, as well as the district court judge, concluded that the proposed expert testimony on grooming should be allowed.

In making its determination about whether to admit expert witness testimony, the district court follows the parameters of Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Using the guidance of these factors, Rule 702 requires the district court to be a gatekeeper, ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). This inquiry is "a flexible one," *id.* at 594, and "[t]here is 'no definitive checklist or test' for balancing the liberal admissibility standards for relevant evidence and the need to exclude misleading 'junk science.'" *United States v. Semrau*, 693 F.3d 510, 520 (6th Cir. 2012) (quoting *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009)).

Although *Daubert*'s analysis primarily focused upon scientific expert testimony, it is not essential that an expert be a traditional scientist. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Instead, expert witnesses may rely upon their own experiences and "specialized knowledge," so long as the witness "explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is

14

reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendments; *see also United States v. Cunningham*, 679 F.3d 355, 378–79 (6th Cir. 2012) (explaining that the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience). Whether evaluating a scientific expert or an experiential expert, a court "must examine the expert witness's testimony for reliability and relevance." *United States v. Martinez*, 588 F.3d 301, 323 (6th Cir. 2009); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

The district court did not abuse its discretion in permitting Agent Isom's expert testimony. Miller urges this Court to disregard several of our sister circuits' holdings that admitting expert testimony regarding grooming practices is not an abuse of discretion, and instead to follow the lead of a district court in Maine. *Compare United States v. Hayward*, 359 F.3d 631, 636–37 (3d Cir. 2004) (holding that district court did not abuse its discretion by allowing expert testimony regarding the general patterns of behavior exhibited by child molesters in finding and seducing their victims), *United States v. Hitt*, 473 F.3d 146, 158–59 (5th Cir. 2006) (finding that the district court's decision to admit expert testimony regarding the grooming methods of sexual abusers of children was not an abuse of discretion), *United States v. Dingwall*, 6 F.4th 744, 754 (7th Cir. 2021) ("[I]n prosecutions for sexual abuse of minors, courts frequently admit expert evidence about 'grooming' to help the jury understand how sex abusers of children develop an emotional relationship with a minor before initiating sexual activity." (citation omitted)), *United States v. Halamek*, 5 F.4th 1081, 1088 (9th Cir. 2021) (finding district court properly admitted expert testimony, as "[e]xtensive experience interviewing victims can qualify a person to testify about the relationships those victims tend to have with their abusers"), *and United States v. Batton*, 602 F.3d 1191, 1202 (10th Cir. 2010) ("We do not find the trial court abused its discretion in concluding the jurors would benefit from learning of the modus operandi of sex offenders.

15

The methods sex offenders use are not necessarily common knowledge."), *with United States v. Raymond*, 700 F. Supp. 2d 142, 151 (D. Me. 2010) (finding that expert's testimony about the behavioral patterns of child molesters was "not specialized knowledge needed to assist the jury to determine a fact at issue"). Notably, Miller largely ignores the deferential standard of review and does not cite to a single federal court of appeals case that has held that admitting this type of expert testimony was an abuse of discretion; instead, he cites to a district court case that analyzed the parties' *Daubert* arguments in the first instance.

Nonetheless, applying the *Daubert* standard to this case, Agent Isom was qualified to provide expert testimony on grooming. Agent Isom has been a special agent with the FBI for nearly 20 years, ten of which involved her specifically focusing on crimes against children. In addition to her field experience, Agent Isom has received approximately 400 hours of specialized training related to crimes against children, including specialized training on the grooming of children for sex offending. This training enabled Agent Isom to obtain her certification to conduct behavioral analysis for the FBI. Agent Isom has also conducted trainings and presented at conferences related to child sexual abuse. Throughout her career, Agent Isom has been involved with hundreds of child sex offense investigations, which have enabled her to interview child sex offenders, as well as observe and analyze the grooming behaviors of sexual predators. *Cf. Halamek*, 5 F.4th at 1088 ("Extensive experience interviewing victims can qualify a person to testify about the relationships those victims tend to have with their abusers."); *LaVictor*, 848 F.3d at 443 ("Courts have consistently allowed expert witnesses to testify concerning domestic violence even in circumstances where the research is not supported by exhaustive statistical evidence."); *United States v. Bryant*, 654 F. App'x 807, 814 (6th Cir. 2016) (per curiam) (affirming district court's conclusion that expert on prostitution practices was qualified where the expert had been an

16

FBI agent for many years and had extensive education and training in the area of child sex-trafficking). This experience more than qualifies Agent Isom to testify as an expert in this realm.

As is also required by *Daubert* and Rule 702, the testimony related to grooming would help the trier of fact understand a relevant issue. "The relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *LaVictor*, 848 F.3d at 442 (quoting *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)). Grooming methods are relevant to evaluating Miller's behavior and may be fairly considered to be "beyond the common knowledge of lay jurors." *Batton*, 602 F.3d at 1201. Contrary to how a lay person might conceive of an inappropriate relationship with a minor, Miller and H.E.'s communications did not consist of a pattern of sexually suggestive remarks, sexual photos, or numerous acts of overtly sexual touching. Instead, the text messages between Miller and H.E. could be viewed as seemingly innocent and loving, or the messages could be viewed as part of a seduction technique with which the jurors are likely not familiar. The expert testimony in this case was intended to assist the jurors in making that distinction. In other words, the testimony at issue could be fairly viewed as assisting the jury in assessing and contextualizing the proffered communications between Miller and H.E. *Cf. id.* at 1202 ("The methods sex offenders use are not necessarily common knowledge."); *Halamek*, 5 F.4th at 1088 (noting that several other circuit courts have held that admitting expert testimony about grooming is not an abuse of discretion because the testimony "illuminate[s] how seemingly innocent conduct . . . could be part of a seduction technique" (alteration in original) (citations omitted)).

Finally, the prejudicial effect of the admission of Agent Isom's testimony did not substantially outweigh its probative value. *See* Fed. R. Evid. 403. A defendant may very well be prejudiced where the expert's description of child sex offenders' general behaviors closely aligns

17

with his own actions; however, this prejudice is not necessarily "unfair." *Cf. United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986) (per curiam) (explaining that "unfair prejudice" does not include "damage to the defendant's case that results from the legitimate probative force of the evidence"). Agent Isom did not testify about Miller's actions in this case, admitted that she did not review the specific text messages at issue, and did not suggest to the jury that it should deem Miller's actions as grooming. *Cf. United States v. Stapleton*, No. 12-11-ART, 2013 WL 5966122, at *6 (E.D. Ky. Nov. 8, 2013) (evaluating an expert witness' proposed testimony under Rule 403 and holding that the expert's "testimony about the usual features of pill mills is fair game, but his opinion analyzing the [defendants'] pain clinic is 'substantially outweighed' by the danger of unfair prejudice"). Accordingly, the district court did not abuse its discretion in determining that the prejudicial effect of Agent Isom's testimony about grooming did not substantially outweigh its probative value.

Where the vast majority of courts to consider the issue have determined that expert testimony on "grooming" is helpful and admissible, the district court cannot be said to have abused its broad discretion in holding the same. The text messages at issue in this case are ambiguous, and the testimony at issue could be fairly viewed as assisting the jury in assessing and contextualizing the proffered communications between Miller and H.E. The expert testimony at issue was therefore properly admitted.

## C. Public Trial Right

Turning to Miller's final argument on appeal, Miller challenges the district court's order that Miller's wife, Bridgette Miller, and the woman sitting next to her leave the courtroom for the remainder of the first day of trial. The parties agree that Miller's attorney did not object to the partial closure of the courtroom at the time that the two women were ordered removed. Instead,

18

Miller's attorney stated that "Ms. Miller . . . would gladly step out for the rest of [Miranda Stevens'] testimony."  Trial Tr. Vol. I, R. 190, Page ID #2810.

### 1.  Standard of Review

"[T]he failure to raise a constitutional challenge before the district court results in plain error review."  *United States v. Doxey*, 833 F.3d 692, 709 (6th Cir. 2016) (collecting cases).  To demonstrate plain error, a defendant must establish "(1) error, (2) that is plain," "(3) that affect[ed] substantial rights," and, assuming that a defendant can show all three conditions, (4) had a serious effect on "the fairness, integrity, or public reputation of judicial proceedings."  *Doxey*, 833 F.3d at 709 (citing *Johnson v. United States*, 520 U.S. 461, 466–67 (1997)).  In the context of a public trial violation, if an unlawful closure amounts to a plain error, the third and fourth prongs of plain error review are readily satisfied due to the structural nature of the error, which permeates the core of the defendant's rights and the trial's fairness.

### 2.  Analysis

Miller argues that the exclusion of his wife, Mrs. Miller, and her companion from the courtroom at the end of Stevens' testimony violated his Sixth Amendment right to a public trial.  U.S. CONST. AMEND. VI.  The right to a public trial protects significant interests, such as allowing public scrutiny of the trial procedures and discouraging perjury.  *See Waller v. Georgia*, 467 U.S. 39, 46–47 (1984).  Indeed, "when courthouse doors are closed, it affects the integrity of the entire judicial process."  *United States v. Salaam*, No. 21-3566, 2024 WL 3163256, at *10 (6th Cir. June 25, 2024) (Clay, J., dissenting in part).  In this case, however, the district court did not order a complete closure of the courtroom to the public; instead, the court partially closed the courtroom by ordering two members of the public to leave for the remainder of one witness' testimony.

*United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015) (defining a partial closure of a trial as "excluding one or more, but not all, individuals for some period").

Even though "[b]oth partial and total closures burden the defendant's constitutional rights," this Court has adopted a "more lenient standard" where a less impactful, partial closure is challenged. *Simmons*, 797 F.3d at 413–14 (quotation omitted); *see also Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992) (noting that courts have "reasoned that a less stringent standard was justified because a partial closure does not implicate the same secrecy and fairness concerns that a total closure does"). To justify a partial closure of the courtroom, (1) the government must show a "substantial reason" that is "likely to be prejudiced" absent the closure; (2) "the closure must be 'narrowly tailored'"; (3) "the trial court must consider reasonable alternatives"; and (4) "the trial court must make findings adequate to support the closure." *United States v. Hendricks*, 950 F.3d 348, 355 (6th Cir. 2020) (quoting *Simmons*, 797 F.3d at 414).[2]

In this case, during Stevens' testimony, the district court received reports from a United States Marshal, a member of the FBI, and a victim/witness advocate that "[the witness'] sister, Bridgett [Miller], and the woman sitting to her right . . . have been gesturing, have been talking, and have been making facial expressions towards the witness." Trial Tr. Vol. I, R. 190, Page ID #2809–10. One of the reports described the women's actions as "simply intimidation." *Id.* at Page ID #2810. Based on these reports, the government requested either an admonishment from the

---

[2] It is not at all clear that the district court's inherent authority and responsibility to maintain order and decorum in the courtroom should in all circumstances be evaluated in the context of the Sixth Amendment's public trial right. For it goes without saying that even the defendant's right to a fair and impartial trial could be jeopardized in the absence of basic courtroom order. Although the public trial right should be regarded as sacrosanct and is not to be compromised or abridged, there may be extreme circumstances in which the court in its discretion may resort to extraordinary measures simply to maintain order.

court, or for the court to order the two women to leave the courtroom for the short remainder of the witness' testimony. When the district court prompted Miller's attorney to respond, he stated that he could not see the two women with his back turned to them during his cross examination, but that "Ms. Miller told [him] that she would gladly step out for the rest of this testimony." *Id.* The court then stated:

> Thank you, Mr. Moffatt. The Court is concerned about observations of expressions and loud discussions that have been shared by various individuals who are here in the court including employees of the Court. These types of expressions, gestures, any loud discussions may be an impermissible attempt to intimidate a witness which would subject individuals to serious sanctions issued by the Court. These types of things will not be permitted in my courtroom. For the remainder of Ms. Stevens' testimony, Bridgett Miller and the woman seated next to Ms. Miller are ordered to leave the courtroom. They will be permitted to return tomorrow morning. However, if this conduct continues, they will not be permitted in the courtroom, and the Court will consider a motion from the United States.

*Id.* at Page ID #2811. After the district court's ruling, the jury was called back in for less than ten additional minutes of Stevens' testimony. Miller challenges the district court's findings on appeal, arguing that the court never concluded that the interest in preventing witness intimidation was "likely to be prejudiced," and that the district court's closure was not narrowly tailored because it failed to consider any reasonable alternatives, such as an admonition. *Simmons*, 797 F.3d at 414.

Taking each argument in turn, courts have consistently held that preventing witness intimidation constitutes a substantial reason to justify the partial closure of the courtroom. *Id.* (collecting cases). Indeed, the need to prevent witness intimidation has even satisfied the higher "overriding interest" requirement to justify the *complete* closure of a courtroom. *Id.* When the government notified the district court about the spectators' behavior, the government's proffer was extremely specific and involved three separate, credible eyewitness accounts. *Cf. Waller*, 467 U.S. at 48 (concluding that "the State's proffer was not specific as to whose privacy interests might be

21

infringed [and] how they would be infringed"). One of these three individuals was a victim advocate, who is specifically trained to look for these types of intimidating circumstances and to support the witnesses. While Miller tries to avoid this conclusion by highlighting that the district court stated the spectators' conduct "*may be*" an attempt at witness intimidation, rather than would "*likely*" intimidate the witness, the government's specific proffer and the record clearly indicate that the first prong has been met. Even if the district court should have used stronger language, this Court can "glean sufficient support for a partial temporary closure from the record." *Simmons*, 797 F.3d at 415 (quoting *United States v. Farmer*, 32 F.3d 369, 371 (8th Cir. 1994)).

Although the district court's order was arguably narrowly tailored to the circumstances by only excluding the two problematic spectators and by permitting the two women to attend the rest of the trial, the district court did not consider reasonable alternatives to the partial closure on the record. As Miller points out, the district court could have simply admonished Mrs. Miller and her companion, or it could have repositioned them to keep a closer eye on them. However, Miller's attorney "agree[d] in open court" with the government's request to exclude Mrs. Miller for the remainder of Stevens' testimony and now seeks on appeal to "charge the court with error in following that course." *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002) (citation omitted). And Miller's attorney affirmatively consented to the partial closure *before* the trial court proposed any solution or course of conduct. *Cf. Grant v. Brigano*, No. C-1-03-896, 2007 WL 2782742, at *8 (S.D. Ohio Sept. 24, 2007) (noting that the defendant "more than merely acquiesced to the trial court's proposal [to close the courtroom]—he affirmatively consented to the procedure"). Accordingly, the district court arguably had no reason to consider the realm of alternate possibilities where both parties affirmatively agreed on a solution, and the court appropriately excluded Mrs. Miller and her companion from the courtroom for the short remainder

of Stevens' testimony.[3] *Cf. Levine v. United States*, 362 U.S. 610, 619–20 (1960) ("Due regard generally for the public nature of the judicial process does not require disregard of the solid demands of the fair administration of justice in favor of a party who, at the appropriate time and acting under advice of counsel, saw no disregard of a right, but raises an abstract claim only as an afterthought on appeal."); *United States v. Gomez*, 705 F.3d 68, 76 (2d Cir. 2013) (holding that defendant's public trial claim provided no basis for relief where "the fairness and public reputation of the proceeding would be called into serious question if a defendant were allowed to gain a new trial on the basis of the very procedure he had invited").

After Miller's attorney affirmatively agreed to one of the solutions that the government posed, the district court made adequate findings on the record to support the partial closure. The court noted its concern regarding witness intimidation and the expressions and loud discussions occurring in the courtroom. The court accordingly removed Mrs. Miller and the woman seated next to her for the remainder of the testimony, and agreed that they could return for the rest of the trial. This rationale is certainly "adequate to support the closure" and "specific enough that a reviewing court can determine whether the closure order was properly entered." *Waller*, 486 U.S. at 45, 48; *cf. Simmons*, 797 F.3d at 415 (granting a new trial where, other than repeating the vague, non-specific concerns of the prosecutor, "the district court did not articulate any facts supporting its decision").

---

[3] Although the district court has an independent obligation to enforce the public trial right—even where the parties agree to a course of action—this case involves a partial closure, rather than a complete courtroom closure. A partial closure impacts a defendant's Sixth Amendment rights to a lesser extent, and is "not as deserving of such a rigorous level of constitutional scrutiny." *Simmons*, 797 F.3d at 413 (citing *Judd v. Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001)).

Although the Sixth Amendment's public trial right is paramount in the administration of the judicial process, the district court did not err in its decision to exclude Mrs. Miller and her companion from the courtroom during the short remainder of Stevens' testimony. Based on three separate accounts, the district court fairly concluded that the two spectators were likely to intimidate Stevens and made the appropriate factual findings to support this decision, which was endorsed by Miller's attorney.

## III. CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.